ON MOTION FOR REHEARING

WARNER, J.
We deny the motion for rehearing and rehearing en banc but withdraw our prior opinion and substitute the following in its place.
This is an appeal from an order determining liability in favor of a class of workers represented by plaintiffs/appellees, Pinnock and Patterson, for additional wages due under an employment contract which provided for the appellees to harvest sugar cane for appellant, Sugar Cane Growers Cooperative of Florida, Inc. (“Cooperative”). The trial court determined that the contract terms were unambiguous and required the payment of wages after the Cooperative terminated the employment. In the alternative, the trial court found that the greater weight of the credible evidence justified an interpretation of the contract favoring additional wages to the employees. Because we find that the contract terms unambiguously ended wage payments when the employees’ work opportunity terminated, we reverse.
The Cooperative hired Pinnock and Patterson as temporary foreign workers pursuant to the H-2A visa program under 8 U.S.C. § 1101 et seq., as hand harvesters of sugar cane during the 1988-89 sugar cane season in Palm Beach County. In a prior opinion regarding other suits by the workers against various sugar cane growers, we explained the certification procedure:
The appellees are sugar cane cutters who work in the cane fields of south Florida cutting sugar cane for the appellant companies. Most, if not all, of the cane workers are foreigners, mainly from Jamaica and other Caribbean Islands. During the years in question in this suit the appellant companies employed approximately 10,000 such- foreign workers. They all entered the United States on temporary visas after the U.S. Department of Labor (DOL) had certified that an insufficient supply of domestic workers was available to fill the positions.
The process of obtaining the certification of the DOL and obtaining the foreign workers is controlled by the Wagner-Peyser Act of 1938, 29 U.S.C. § 49, et seq. One of the purposes of the act is to protect domestic workers from foreign workers whom employers might be able to hire for less than prevailing domestic wages. To obtain the necessary certification to import foreign workers, employers must submit “clearance orders” which are in essence job offers describing the terms and conditions of the job for which workers are sought. The clearance order must state the minimum benefits and wages that the employee will receive as well as describe the working conditions. The “orders” are actually printed forms approved by the DOL. These orders are first circulated within the domestic market of employees. Then, when the employer’s labor needs are not filled during the domestic recruitment, period, the DOL issues a certification for the importation of foreign workers. However, these foreign workers must be employed under the same terms and conditions of work as those offered in the clearance orders. When an employee is hired, an individual work contract, reflecting the terms of the clearance or *532 der, is provided to the worker not later than the day work commences.
Okeelanta Corp. v. Bygrave, 660 So.2d 743, 745 (Fla. 4th DCA 1995).
Negotiation of clearance orders and individual employment contracts has continued for at least twenty years prior to the 1988 contract. For the 1988-89 season, Florida Fruit and Vegetable Association (“FFVA”) prepared and signed the clearance order on behalf of the Cooperative, seeking certification for domestic workers through March 6, 1989, the anticipated end of the harvest. The Department of Labor (“DOL”) granted routine extensions of the certification period when the harvest required it. In 1989, the date was extended to March 10, 1989. While the DOL and FFVA agreed on the terms of the clearance order, the foreign workers never saw it. Instead, they signed individual contracts with the Cooperative. A representative of the West Indies Central Labour Organization (“WICLO”), the worker, and the Cooperative’s agent signed these contracts. According to the testimony of the workers, the contracts were signed in their home countries after the worker was evaluated and passed a physical examination.
As in past years, negotiations for the 1988 contract began in April for the harvest in November. The contract was negotiated by FFVA for companies in Florida, including the Cooperative, and by WICLO on behalf of the workers. WI-CLO is identified in the contract as “acting for and on behalf of the Governments of Barbados, Dominica, Jamaica, St. Lucia, St. Vincent and Grenada ... (hereinafter called the “Government’s Agent”), which has been duly authorized to act for the Government on behalf of West Indies workers.” Article XVIII, paragraph 3, provides:
The worker, in consideration of the time, effort and cost incurred by his Government in providing him the employment opportunity and in negotiating the terms of the Agreement appoints West Indies Central Labour Organization as his exclusive representative to pursue and enforce any legitimate claims arising out of his employment and will submit any such claims to West Indies Central Labour Organization for resolution, including any judicial or administrative litigation that may be warranted.
Under Article XXI, WICLO agreed to represent the worker in any disputes and to furnish lawyers to the workers to pursue legitimate claims.
The contract provided the following, in pertinent part, with regard to the scope and period of employment, employment guarantee, and termination of employment:
ARTICLE I
Scope and Period of Employment
During the period from approximately the _ day of November, 1988, to approximately the 30th day of April, 1989, (unless work opportunity is sooner terminated as hereinafter provided), the Employer agrees to provide agricultural employment to the worker ...
ARTICLE IX
Employment Guarantee
1. The Employer guarantees the worker the opportunity for employment for the hourly equivalent of at least % of the work days (as defined in Article I) of the total period during which the work contract and all extensions thereof are in effect, beginning with the first workday after the worker’s arrival at the place of employment and ending on the termination date specified in this contract or its extension, if any.
(a) If the Employer affords the worker during such period less employment than required under this provision, the worker shall be paid the amount which he would have earned had he, in fact, worked the guaranteed hourly equivalent of the number of days. Where *533 wages are paid on an incentive basis, the worker’s average hourly earnings shall be used for the purpose of computing the amount paid under this guarantee.
ARTICLE XIV
Termination of Employment
1. Termination at other than normal expiration date:
(a) The Employer may terminate the worker’s work opportunity at any time, or
(b) The Employer may advance the end of season termination date as specified in Article I, with the approval of the appropriate government officials, by giving the worker at least 10 days notice in writing and the worker’s period of work opportunity shall terminate upon the expiration of such notice, or
(c) Upon ceasing work by mutual agreement between the worker and the Employer, whichever shall first occur, subject to the provision of Article IX of this Agreement provided that after giving such notice of termination, any day on which no work is available through no fault of the Employer shall not be counted as part of the notice and the termination date shall be extended accordingly.
3. In the event of a contract termination by mutual agreement between the Employer and the worker or the Employer for reasons beyond his control, the Employer shall be responsible for the employment guarantee provided in Article IX of this Agreement for the period of work opportunity as so modified. Reasons beyond his control includes workers whom the Employer is forced to terminate because U.S. workers make themselves available for the job under the Department of Labor’s 50% rule.
4. When an Act of God occurs, the Employer may by notice to the worker and with the agreement of the appropriate government official, terminate the period of work opportunity forthwith or as from such subsequent date as shall be specified in the notice, and the guarantee in Article IX shall cease from the termination of work opportunity accordingly. An Act of God shall mean any frost, hailstorm, flood or drought, or other natural calamity of such character as to make further fulfillment of the contract impossible.
Under Article XXI of the contract, WI-CLO itself had the power, on behalf of any worker, to terminate the work opportunity of a worker upon giving ten days notice in writing or if the worker was being given inadequate work opportunity or improper treatment.
In accordance with the contract, workers arrived in the United States in November for the harvest season and continued to work until March when the harvest finished. The Cooperative posted its ten-day notice pursuant to Article XIV, section 1(b), on or about March 6, 1989, thereby terminating the employment period as of March 16,1989.
Since 1967, sugar cane worker contracts have specified a termination date of'April 30 or later, even though the harvest did not usually extend past March. That was done in order to assure that the workers would be available until April 30, if necessary, because weather and other conditions made it impossible to predict exactly when the harvest would be completed. But each contract had a clause stating that the period could be terminated earlier by the Cooperative’s ten-day written notice of the end of season termination date, which is provided for in Article I, section 3, of the instant contract. According to the Cooperative, that provision would also terminate the period for which the % work opportunity guarantee provided in Article IX was calculated, ending wage liability on that date, the issue that is disputed in this case. WICLO was responsible for administering and enforcing the guarantee for the workers, accumulating payroll data, *534 and sending statements to the companies which owed money under the guarantee .at the end of each season. Its liaison officer in the United States from 1968 to 1991, John’ A. Wilkie, testified that WICLO always used the end of the ten-day notice period as the end of the % guarantee period.
In 1991, the workers filed a class action lawsuit claiming that they were entitled to wages amounting to the % guarantee for the period from March 16, 1989, when the ten-day notice terminated, until April 30, 1989, the date listed in the contract. After extensive pretrial proceedings and discovery, the issue of liability was tried without a jury. The court first ruled that the contract was not ambiguous on its face:
Applying settled rules of contract construction the Court finds that the Agreement is not ambiguous, and that the Plaintiffs’ interpretation is the only one which not only comports with the plain language of the Agreement, renders the Agreement legal, and provides the mutuality of obligation which is essential to the formation of any valid contract. Accordingly, the Court finds that the % guarantee set forth in Article IX of the Agreement was not abated by the Defendant’s service of a ten-day notice, and that the Defendant is liable to the Plaintiffs for the entire contract period set forth in Article I, i.e. from November 1988 through April 30,1989.
After determining that the contract was clear and unambiguous on its face, obviating the need to resort to parol evidence, the court went on to alternatively conclude that even if it did consider the parol evidence presented, its determination would not be altered. The court found that the April 30th termination was critical to the Cooperative because it was the only way to ensure that workers would be available to finish the harvest should it be delayed for any reason:
Construing the [3/4] guarantee as a promise of payment through the contract period identified in Article I provides the necessary consideration for the workers’ promise to remain willing .to work through April 30, 1989, if needed. Indeed, if the contract were interpreted to permit the Defendant to terminate the contract unilaterally and thereby abate the % guarantee period, the contract would fail for want of the necessary mutuality of obligation.
The court also found that federal regulation required the % guarantee to be offered to the workers. As all material terms of employment were required to be included in the clearance order, the trial court concluded that the failure to include the ten-day notice as a basis for termination in the clearance order would indicate that it did not abate the employment guarantee; otherwise, it would have been included. Thus, the failure to include a material term in the clearance order would render it illegal.
The court further rejected testimony which indicated that DOL supported the Cooperative’s interpretation of the contract, and it determined that WICLO had no power to enforce workers’ rights with respect to the guarantees. It also commented that no person or organization was actively pursuing the best interests of the workers. Thus, the court determined that the greater weight of the credible evidence supported the plaintiffs’ interpretation of the contract. Finally, the court concluded that even if all other aids to construction did not resolve the ambiguity, the principle that a contract should be construed against the drafter of the contract, which in this case was FFVA as agent for the Cooperative and other growers, would still mandate adoption of the workers’ position. It thus entered a summary judgment of liability against the Cooperative.
Construction of a contract is a matter of law, so an appellate court is free to reassess the contract and arrive at a conclusion different from the trial court. See Broward County v. LaPointe, 685 So.2d 889, 892 (Fla. 4th DCA 1996). Therefore, *535 we may consider de novo whether the contract terms are unambiguous.
The court’s analysis of the provisions of this contract begins with the employment guarantee in Article IX which it determines is a guarantee of the opportunity to work or for wages for the “contract period as set out in Article I, i.e. from November 1988 to through April 30, 1989.” The trial court, however, does not give effect to the language of Article I which states that the period is through April 30th “unless work opportunity is sooner terminated as hereinafter provided.” The court refers to termination in Article XIV and concludes that the methods of termination in Article XTV, section 1, are subject to the guarantee set forth in Article IX. Because it determines that only sections three and four of Article XIV specifically allow for abatement of the % guarantee of Article IX, applying the contract construction principle of expressio unius est exclusio alterius, the court concludes that section 1 terminations do not include an abatement of the work opportunity. This last finding is contrary to the very language of section 1(b) which provides that “the worker’s period of work opportunity shall terminate” upon the expiration of the ten-day notice. This language is very similar to language abating the employment guarantee in sections 3 and 4.
In construing a contract, the legal effect of its provisions should be determined from the words of the entire contract. See Hoffman v. Robinson, 213 So.2d 267, 268 (Fla. 3d DCA 1968). Reviewing all of the provisions of the contract, we find that the trial court’s construction does not comport with this principle, as it leaves out several words and phrases, particularly by ignoring the parenthetical after the termination date of April 30th that work opportunity may be “sooner terminated” and in failing to acknowledge the termination of the work opportunity in Article XIV, section 1(b). We find that the construction placed on the contract by the Cooperative is the only construction which gives effect to all of the provisions of the contract.
Article I, section 3, states that the employer will provide employment to the worker until “approximately the 30th day of April, 1989, (unless work opportunity is sooner terminated as hereinafter provided).” (emphasis added). In Article IX, which defines the “employment guarantee,” the work opportunity is guaranteed to be the hourly equivalent of at least % of the work days (as defined in Article I) of the “total period during which the work contract and all extensions thereof are in effect, beginning with the first workday after the worker’s arrival ... and ending on the termination date specified in this contract or its extension, if any.” (emphasis added). From these provisions, a worker knows that his employment may end sooner than April 30,1989, as provided in the contract. Furthermore, the guarantee of work opportunity for % of the work days continues until the termination date specified in the contract. Article IX, section 1(a), provides for a guarantee of wages “during such period” even when the employer does not provide the equivalent work opportunity of % of the work days as defined in Article I. “Such period” can only refer to the “total period” described immediately above in section 1, or that period “beginning with the first workday after the worker’s arrival at the place of employment and ending on the termination date specified in this contract or its extension, if any.”[1]
Thus, both the work opportunity guarantee and the wage guarantee continue only to the termination date of the contract. In short, the employer guarantees to provide a minimum number of days of work to the worker, and if the employer fails to provide that minimum, then the *536 worker would still be paid for that minimum amount of work. But it is clear from the contract that the work opportunity guarantee and the wage guarantee are tied together and make up the employment guarantee, which terminates on a single date.
How is the termination date calculated in the contract? Article I states that the contract period ends approximately April 30th unless the “work opportunity” is sooner terminated as provided in the contract. Article XIV, section 1, is entitled “Termination at other than normal expiration date.” It describes three alternate methods of termination: section 1(a) is a unilateral termination at any time; section 1(b) advances the end of season termination date after the ten-day notice to the worker; and section 1(c) is a mutual agreement to terminate early. All provisions are subject to the guarantee provisions in Article IX. However, only section 1(b) actually provides for a change to the termination date specified in Article I, which in turn changes the termination date of the guarantees of Article IX.
Article XIV, section 1(b), provides for termination after the ten-day notice. That provision specifically states that the employer may “advance the end of season termination date as specified in Article I ” by giving a ten-day notice in writing, and “the worker’s period of work opportunity shall terminate upon the expiration of such notice.... ” First, the only termination date specified in Article I is the April 30th date. Thus, the ten-day notice provision “advances” that termination date. In addition, the Article references the work opportunity guarantee by stating that it terminates on the expiration of the ten-day notice. Since the wage guarantee in Article IX, section 1(a), applies only during'the same period as the work opportunity guarantee, namely through the termination date of the contract, and the ten-day notice advances that date, the change in termination date also advances the wage guarantee.
The workers argue that in Article XIV the various termination clauses would be redundant under the interpretation of the Cooperative. . We think not. The other methods of early termination contained in Article XIV are subject to the employment guarantee in Article IX. The employment guarantee consists of a work opportunity guarantee and a wage guarantee. The early termination methods of Article XIV abate both guarantees only in certain cases, specifically only those reasons for abatement which are listed in sections 3 and 4 of Article XIV. For other reasons than those listed, the wage guarantee is not abated. For example, if the employer unilaterally terminated the worker’s work opportunity because of no reason at all, the worker would still be guaranteed his wages through the termination date of the contract. On the other hand, if the employer unilaterally terminated the work opportunity because of a flood, under section 4 the wage guarantee would cease from the termination of the work opportunity.
The trial court’s analysis of these provisions, based on its application of the principle of expressio unius est exclusio alter-ius, does not comport with the plain meaning of the contract terms. The court found that sections 3 and 4 specifically referenced an abatement of the guarantee, while section 1 did not. However, section 1(b) provided for the expiration of the work opportunity, stating that after the ten-day notice period “the worker’s period of work opportunity shall terminate.” Similarly, section 3 states that where a contract is terminated by mutual agreement or for reasons beyond the control of the employer, “[t]he Employer shall be responsible for the Employment guarantee provided in Article IX of this Agreement for the period of work opportunity as so modified.” Again, in section 4, when an [a]ct of God intervenes, the Employer may “terminate the period of work opportunity forthwith ... and the guarantee in Article IX shall cease from the termi *537 nation of work opportunity accordingly.” The three clauses all reference termination of work opportunity. If the doctrine pointed out by the court applies at all, it applies to sections 1(b), 3, and 4 equally, and not to other terminations under 1(a). Thus, we find that the trial court’s application of the contract construction principle of expressio unius est exclusio alterius does not yield an interpretation that the intent of the contract was to guarantee wages through April 30, 1989, in the case at bar.
Alternatively, the trial court determined that guarantee of wages through April 30, 1989, provided the necessary consideration for the workers’ promise to be available until that date, if needed. It found that interpreting the contract to allow a unilateral termination under section 1(b) by the employer would make the contract fail for want of the necessary mutuality of obligation. First, the contract also permitted the worker to terminate the contract upon ten-day notice under Article XXI, thus providing the parties with mutual remedies. Second, we have held that “the fact that a contract may, under certain definite circumstances, be terminable at the option of one of the parties does not, as a matter of law, render the contract unenforceable for want of mutuality.” Bossert v. Palm Beach County Comprehensive Community Mental Health Ctr., Inc., 404 So.2d 1138, 1139 (Fla. 4th DCA 1981); see also Thompson v. Shell Petroleum Corp., 130 Fla. 652, 178 So. 413, 419 (1938). In Bossert, the contract between the employee and the employer gave the employee the right to adjust his hours of work by serving written notice two weeks in advance of the date on which he chose to reduce his hours. When the employer terminated him, the employee filed suit for breach of contract. The employer successfully argued to the trial court that the contract was unenforceable for lack of mutuality, because the employee had the unilateral right to restrict his hours. In reversing the dismissal of the employee’s suit, our court held that the requirement of two weeks notice of the right to terminate or restrict was sufficient consideration so as to avoid a claim of lack of mutuality. See 404 So.2d at 1139.
Of similar effect is Wright & Seaton, Inc. v. Prescott, 420 So.2d 623 (Fla. 4th DCA 1982), in which the contract of employment gave the employer the right to terminate the employee at any time with or without cause, upon written notice. Our court quoted 1 S. Williston, A Treatise on the Law of Contracts § 105, at 418-19 (3d ed.1957), for the proposition that:
the tendency is to interpret even a slight restriction on the exercise of the right of cancellation as constituting such legal detriment as will satisfy the requirement of sufficient consideration; for example, where the reservation of right to cancel is for cause, or by written notice, or after a definite period of notice, or upon the occurrence of some extrinsic event,....
Id. at 627 (emphasis supplied). We also held that lack of mutuality of contract is not a defense in the case of an- executed contract. See id. Similarly, the instant case involves a ten-day notice of termination, a restriction on the right to terminate, and is thus legally enforceable. Moreover, the contract was performed on both sides; thus, lack of mutuality, if any, at its inception is no impediment to the executed contract.
Finally, the trial court ruled that the contract was essentially illegal due to the ten-day termination notice because that term was not included within the clearance order. However, the clearance order is prepared for purposes of first offering employment to domestic workers and in this case provided for certification of work for domestic workers through March 10, 1989. Without the ten-day termination clause in the foreign worker’s contract, the foreign worker could be employed in excess of the period advertised to domestic workers in the clearance order, which is a violation of federal law. *538 See 20 C.F.R. § 655.102(1988).[2] Thus, to interpret the contract in the way favored by the workers would permit the illegal employment of foreign workers beyond the period of employment in the clearance order for domestic workers. Moreover, allowing the foreign workers to be paid through April 80, 1989, whether or not they were provided with work opportunity, when domestic workers had no such right, is to give preferential treatment to the foreign workers, which is illegal as a matter of law. See 20 C.F.R. § 655.102(a).
We have construed the contract in accordance with its terms. Our interpretation is based solely upon the language of the contract, the best evidence of the intent of the parties. See Jacobs v. Petrino, 351 So.2d 1086, 1039 (Fla. 4th DCA 1976). The contract is clear and unambiguous. It does not lack mutuality, and it is not illegal. Based upon the terms of the contract, the workers are entitled to pay through the time specified in the end of season termination notice and not through April 30, 1989. We therefore reverse the decision of the trial court determining liability against the appellant and remand for proceedings consistent with this opinion.
FARMER and SHAHOOD, JJ., concur.

. This language is taken verbatim from 20 C.F.R. § 655.102(b)(6) regarding the three-fourth's guarantee. Art. IX, Section 1(b) also copies additional language of 20 C.F.R. § 655.102(b)(6).

. This section provides in pertinent part: "(a) Preferential treatment of aliens prohibited. The employer’s job offer to U.$. workers shall offer the U.S. workers no less than the same benefits, wages, and working conditions which the employer is offering, intends to offer, or will provide to H-2A workers.”