846 So.2d 595 (2003)
Noreen DOWS and Gregory Dows, individually, and in their capacity as natural parents and guardians of Christopher Dows, a minor, Appellants,
v.
NIKE, INC., The Sports Authority, Inc., and The Sports Authority Florida, Inc., Appellees.
No. 4D02-695.
District Court of Appeal of Florida, Fourth District.
May 7, 2003.
Rehearing Denied June 17, 2003.
*597 Julie H. Littky-Rubin of Lytal, Reiter, Clark, Fountain & Williams, LLP, West Palm Beach, and Julie A. Hager, Fort Lauderdale, for Appellants.
Shelley H. Leinicke of Wicker, Smith, O'Hara, McCoy, Graham & Ford, P.A., Fort Lauderdale, for Appellees.
HAZOURI, J.
Noreen Dows and Gregory Dows, individually and in their capacity as natural parents and guardian of Christopher Dows, a minor, (Dows) appeal from an order enforcing a settlement agreement with Nike, Inc., The Sports Authority, Inc. and The Sports Authority Florida, Inc. (Nike). We reverse.
Dows made a claim against Nike for an injury to Christopher's right foot primarily located in the area of his heel. Dows claimed that Nike had manufactured and sold a defective sneaker, containing a foreign metal object that allegedly caused Christopher to suffer from osteomyelitis[1] to the heel resulting in serious permanent injuries. Prior to filing suit, the parties entered into a presuit mediation agreement. The mediation agreement consisted of a handwritten document that purports to recognize that the value of the claim was dependent upon whether Christopher had ever suffered from osteomyelitis in his heel as a result of the injury and, if so, whether he would require further treatment for osteomyelitis. The mediation agreement established a three-tiered settlement structure that was dependent upon an independent examining physician's opinions on the nature and prognosis of the injury.
The three scenarios contemplated in the mediation agreement provided that Nike would pay: a) $50,000 in the event that the independent physician determined that Christopher had never suffered from osteomyelitis at any time; b) $100,000 if the independent physician determined that *598 Christopher suffered from osteomyelitis as a result of the incident and that the osteomyelitis would not return; and c) $300,000 if the independent physician determined that Christopher continued to have a latent condition of osteomyelitis that required further treatment. This agreement further provided that counsel for Dows and counsel for Nike would enter into a formalized agreement and submit the same for client approval. Over the next several months, the parties drafted, redrafted, and executed a typewritten settlement agreement which was completed and signed by all parties in June of 2000.
The settlement agreement provided that the independent physician would be agreed upon by both parties, given all the records and asked to submit a report on Christopher's condition in addition to answering specific questions drafted by the parties. Specifically, the settlement agreement provided as follows:
4. The parties will also request the selected physician to respond to specific written questions regarding the condition of the minor child. The parties will agree to the exact question [sic] and their precise phrasing. The questions will include the following areas of inquiry:
(a) Within a reasonable degree of medical probability, did the minor ever suffer from osteomyelitis caused by the incident that occurred on or about August 29, 1996?
(b) If the minor child suffered from osteomyelitis, will he require any further treatment to the injured area within a reasonable degree of medical probability?
5. (a) In the event the elected physician answers in the negative to question 5(a), claimant and his guardian agree to accept Fifty Thousand and no/100 Dollars ($50,000.00) in full and final settlement of this case.
(b) In the event the selected physician answers in the negative to question 5(b), claimant and his guardian agree to accept One Hundred Thousand and no/100 Dollars ($100,000.00) in full and final settlement of the case.
(c) In the event the selected physician answers in the affirmative to question 5(b), claimant and his guardian agree to accept Three Hundred Thousand and No/100 Dollars ($300,000.00) in full and final settlement of all claims.[2]
Nike's counsel originally proposed that question 4(b) be phrased as follows: "If the minor child suffered from osteomyelitis, will he require further treatment in the future within a reasonable degree of medical probability." However, in a letter dated March 16, 2000, Dows's counsel requested that question 4(b) be phrased as it appears in the settlement agreement.
Dr. John Delahay was chosen by the parties as the independent physician. After the parties agreed upon the questions to ask the doctor, Nike's counsel wrote to Dr. Delahay as follows:
Dear Dr. Delahay:
We have previously made arrangements for you to evaluate Christopher Dows in the matter referenced above. The appointment for your independent medical examination is scheduled for July 21, 2000 at 10:30 A.M.
In addition to your independent medical examination findings and opinions, we are asking you to answer the questions set forth below:

*599 (1.) Within a reasonable degree of medical probability, did the minor ever suffer from osteomyelitis caused by the incident that occurred on or about August 29, 1996?
(2.) If the minor child suffered from osteomyelitis, will he require any further treatment to the injured area within a reasonable degree of medical probability?
We would greatly appreciate it if your independent medical examination report would specifically answer those two (2) questions in addition to your other findings and opinions.
Thank you for your cooperation in this regard.
Very truly yours,
/s/ Dennis M. O'Hara
On August 1, 2000, Dr. Delahay issued a report indicating that Christopher had suffered from superficial osteomyelitis, and was left with a bony exostosis as a result of that infection. Dr. Delahay commented that he believed Christopher would "benefit by removal of this bony spur on the Plantar surface of the heel."
Upon receipt of Dr. Delahay's report, Dows's counsel, Gary Gelch, wrote a letter to Nike's counsel, Dennis O'Hara, dated August 7, 2000, stating in pertinent part:
Based upon Dr. Delahay's summary, it is clear that he believes Christopher has osteomyelitis as a result of the incident that occurred on or about August 29, 1996. Furthermore, Dr. Delahay states that Christopher will benefit from the surgical removal of the bony spur that is on the heel that was caused by the infection.
Based upon Dr. Delahay's report, the undersigned and Mrs. Dows, on behalf of her minor son, Christopher, feel that Christopher is entitled to $300,000 pursuant to paragraph 5 of the settlement agreement.
O'Hara responded, via a letter dated August 8, 2000, and expressed some "confusion" as to whether Dr. Delahay's report adequately answered the questions posed in the letter setting up the medical examination. O'Hara's letter of August 8, 2000, does not express the nature of his "confusion" but proposed sending another letter to Dr. Delahay in order to eliminate the "confusion." With Gelch's agreement, O'Hara sent the following letter dated August 9, 2000, to Dr. Delahay:
Dear Dr. Delahay:
There has been confusion with regard to your August 1, 2000 report concerning Christopher Dows. In order to eliminate this confusion both the family of Christopher Dows and Nike, Inc. request that you answer the following questions in a YES or NO manner. Those specific questions are:
1. Within a reasonable degree of medical probability, did the minor ever suffer from osteomyelitis caused by the incident that occurred on or about August 28, 1996?
2. If the minor child suffered from osteomyelitis, will he require any further treatment to the injured area within a reasonable degree of medical probability?
Would you kindly send the responses to this office with a copy to Attorney Gary Gelch whose address is 350 East Las Olas Boulevard, Suite 1440, Fort Lauderdale, FL 33301.
Thank you for your cooperation in this regard.
Very truly yours,
Dennis M. O'Hara
Dr. Delahay responded by answering question one "yes" and question two "no," but qualified his answer to question two *600 with a parenthetical which stated "not for osteomyelitis, that is cured." Mrs. Dows subsequently faxed a letter to Dr. Delahay, seeking clarification to his answer to question two. The letter stated: "We are not asking if further treatment of osteomyelitis is required, we are asking if any further treatment to the injured area is required within a reasonable degree of medical probability." Dr. Delahay responded to the letter by answering "no" to question two without any reference to further treatment or removal of the bony spur on the Plantar surface of Christopher's heel.
Based upon Dr. Delahay's response to O'Hara's letter of August 8, 2000, and his response to Mrs. Dows's subsequent fax, Nike contended that Dows was entitled to only $100,000 in settlement of the claim. However, Dows insisted that the settlement agreement was clear that if Christopher needed any further treatment to the injured area, Nike was obligated to pay $300,000. The parties were unable to agree as to the correct interpretation of their settlement agreement. Thereafter, Dows filed suit against Nike for the personal injuries sustained by Christopher as a result of the incident of August 29, 1996. Nike filed an answer which included inter alia the affirmative defense that the claim was barred by the settlement between the parties as to all claims asserted by Dows.
Both Dows and Nike filed motions to compel and/or motions to enforce settlement. Prior to the hearing on the motion to enforce settlement, Dows took Dr. Delahay's deposition. The deposition clearly reflects that based upon the medical records and the physical examination of Christopher, within a reasonable degree of medical probability: Christopher did, in fact, have osteomyelitis as a result of the incident of August 29, 1996; the osteomyelitis is now cured and not probable to cause him any problems in the future; but, as a result of the osteomyelitis, he will require further treatment to the injured area because of the bony spur which formed in the injured area.
Both sides contended that there was no ambiguity in the settlement agreement, and therefore it should be enforced. However, each side argued that they should prevail based on their interpretation of the plain meaning of the settlement agreement. Nike argued that Dows was only entitled to $100,000 because Dr. Delahay had answered the question that was a product of paragraph 4(a) of the settlement agreement "yes" and in response to the question that was a product of 4(b), Dr. Delahay had answered that the osteomyelitis was cured and that Christopher did not need further treatment for osteomyelitis. Dows argued, on the other hand, that Dr. Delahay had unequivocally answered the question prompted by paragraph 4(b) of the settlement agreement in the affirmative and determined within a reasonable degree of medical probability that Christopher would require further treatment to the injured area and that the "further treatment required" was not dependent upon a continuation of osteomyelitis. The trial court agreed with the position taken by Nike and entered a final order, on February 12, 2002, enforcing settlement in the amount of $100,000. In its final order, the trial court found as follows:
The settlement agreement between the parties is clear and unambiguous. The parties have received the answer of Dr. Delahay to the questions presented him, with the answer to question 4(b) being "NO." The answers of Dr. Delahay to the two questions posed him control the matter of settlement between the parties. The court further finds that Dr. Delahay was agreed to by all parties, and that the plaintiff, Mrs. Dows, specifically asked for clarification of his original *601 response, which clarification was an unqualified "NO" answer to question 4(b).
Dows contends that the trial court erred by enforcing the settlement agreement requiring Nike to pay $100,000 rather than $300,000. We agree.
Construction of a contract is a matter of law, so an appellate court is free to reassess the contract and arrive at a conclusion different from the trial court. Therefore, we may consider de novo whether the contract terms are unambiguous. See Sugar Cane Growers Coop. of Fla. Inc. v. Pinnock, 735 So.2d 530, 534-35 (Fla. 4th DCA 1999). It is fundamental that where a contract is clear and unambiguous in its terms, the court may not give those terms any meaning beyond the plain meaning of the words contained therein. See Burns v. Barfield, 732 So.2d 1202, 1205 (Fla. 4th DCA 1999). Where the terms are unambiguous, the parties' intent must be discerned from the four corners of the document. Id.; see also Barakat v. Broward County Hous. Auth., 771 So.2d 1193, 1194 (Fla. 4th DCA 2000). In the absence of ambiguity, the language itself is the best evidence of the parties' intent and the plain meaning controls. See Barakat, 771 So.2d at 1194.
In Barakat, this court reviewed the applicable portions of the BCHA's Resolution dealing with termination and severance pay of a County housing authority employee, and determined that the employer could not terminate the employee without cause. If terminated, the employee was entitled to severance pay in the amount due, as if the contract had run its full length. In reversing the trial court's final judgment in favor of the employer, this court concluded the trial court's finding that the employee was not entitled to severance pay was directly contrary to the plain language of the Resolution, reasoning:
It is never the role of a trial court to rewrite a contract to make it more reasonable for one of the parties or to relieve a party from what turns out to be a bad bargain. Dickerson Florida Inc. v. McPeek, 651 So.2d 186, 187 (Fla. 4th DCA 1995). A fundamental tenet of contract law is that parties are free to contract, even when one side negotiates a harsh bargain. Green v. Life & Health of Am., 704 So.2d 1386, 1391 (Fla.1998). Had the BCHA wanted to provide for severance pay only when Barakat was terminated without cause, it could have made that a requirement in the Resolution.
Id. at 1195.
In the instant case, the two questions the parties asked Dr. Delahay to answer were:
(1.) Within a reasonable degree of medical probability, did the minor ever suffer from osteomyelitis caused by the incident that occurred on or about August 29, 1996?;
(2.) If the minor child suffered from osteomyelitis, will he require any further treatment to the injured area within a reasonable degree of medical probability? (emphasis added).
The definition of "any," as the third district explained in Acceleration National Service Corp. v. Brickell Financial Services Motor Club, Inc., 541 So.2d 738, 739 (Fla. 3rd DCA 1989), means "one or another without restriction or exception;" often synonymous with "either," "every" or "all." The questions above clearly demonstrate that the parties wanted to know if the minor ever suffered from osteomyelitis caused by the incident, i.e., from the point *602 of the injury until the date of Dr. Delahay's examination and, assuming that the minor child did suffer from osteomyelitis at some point in the past, would there ever be a need for any future treatment to the area that was injured. This was "without restriction or exception."
It is simply not reasonable to read a limitation into question two that the future treatment sought by the question was restricted to future treatment for osteomyelitis only. Had the defendants wanted to restrict the higher settlement figure to the child's need for future treatment for osteomyelitis only, they could have easily inserted such a limitation into the Settlement Agreement. Certainly, if such limitation were meant, the parties could have specifically inserted the limiting words, "will he require any further treatment for osteomyelitis." Instead, the parties simply asked for a "report" regarding the injury, causation and future treatment. Dr. Delahay furnished a report, answering all of those questions. He unequivocally agreed that Christopher would likely require surgery on his heel for the exostosis, a secondary condition to the osteomyelitis.
In seeking to enforce the settlement, defendants provided the trial court with the parties' handwritten mediation agreement in an effort to demonstrate that the parties intended to impose this limitation on the future treatment question as noted in paragraph five of defendants' Motion to Compel and/or Motion to Enforce Settlement:
The paramount issue of concern was whether the Plaintiff ever had osteomyelitis and if so, whether the osteomyelitis had resolved, or in the alternative, would require ongoing treatment for an osteomyelitic condition.
By the plain language of the initial agreement, however, it is clear that the selected physician would answer mutually agreeable questions the parties would draft at a later date.
Settlement agreements are not considered final when the record establishes the parties' intent to take further action prior to the completion of a binding agreement. See Williams v. Ingram, 605 So.2d 890, 893 (Fla. 1st DCA 1992). Where essential terms of an agreement remain open, and subject to future negotiation, there can be no enforceable contract. See Suggs v. Defranco's, Inc., 626 So.2d 1100, 1101 (Fla. 1st DCA 1993). The handwritten mediation document evinced the parties agreement to agree. It also clearly evinced the parties' intent to take further action prior to completing the binding agreement. As such, there was clearly no enforceable settlement at the time of mediation. See Williams, 605 So.2d at 893. The agreement did not become final and enforceable until the parties completed their negotiations on the language of the settlement questions and reduced them to writing in the final agreement. The subsequent negotiations, and the final agreement superceded the "conceptual settlement" achieved during mediation. Therefore, the pre-suit mediation agreement is not the controlling document for this court's consideration.
In enforcing the low end of this settlement, the trial judge advised that it considered the settlement agreement to go beyond the August 1st report and included the answers given by the doctor to the questions that the parties asked of him (i.e., in the letters dated August 9th and 14th). The trial court explained:
Each time, the doctor has responded and answered no. It's my understanding by the parties that it's the answer to those questions, as opposed to anything else, that may be in a report or anything else that may be said that was going to determine *603 that acceptance of which the settlement agreement was to be imposed by the parties.
I also specifically find that together, you all selected the doctor that was used and I think that that's important in the determination and acceptance as opposed to someone saying that the doctor didn't understand. It was this doctor that was agreed to by all parties, also by the plaintiffs, with or without counsel, and however it was drawn up or however it was done, again, it specifically asked for clarification that the plaintiffs are asking this court to render today and the doctor, once again, circled no, so I find that the answer to question number two, because apparently there is no question one, it is clearly no by the doctor, which means that I find the settlement agreement enforceable. (Emphasis added).
While the parties agreed to be bound by the answers to the specific questions delineated in the settlement agreement, the plain language of question two simply asked that if Christopher had suffered from osteomyelitis, would he require any further treatment to the injured area, i.e. his heel. Dr. Delahay plainly answered that question "yes." It was only upon reinterpreting the meaning of the second question, as if Christopher would require future treatment only for osteomyelitis, that he answered the question "no."
When Dr. Delahay responded to the August 8th and August 9th letters from the respective parties, he felt obligated to give a qualified answer to question two which asked: "If the minor child suffered from osteomyelitis, will he require any further treatment to the injured area within a reasonable degree of medical probability?" Dr. Delahay responded "no" but then wrote in parentheses, "not for osteomyelitis, that is cured." Then, a week later, on August 14th, Dr. Delahay simply answered question two with an unequivocal "no." While Dr. Delahay admitted that Christopher was likely to require additional treatment for his heel, he subsequently answered that Christopher would not need future treatment because the child at the time of examination did not suffer from osteomyelitis, and therefore would not require future treatment specifically for osteomyelitis. In Dr. Delahay's deposition, he stated that he was told by Nike's counsel that he "could not qualify [his] response," and "was put in [a] box" regarding his answer. Placing the doctor in a box was a unilateral modification to the settlement agreement.
The unilateral modification of a contract is unenforceable. See Levinson v. Carnival Corp., 725 So.2d 1160, 1162 (Fla. 3d DCA 1998). Any subsequent modification requires consent and a meeting of the minds of the parties to the contract whose rights or responsibilities are sought to be affected by the modification. Id; see also Binninger v. Hutchinson, 355 So.2d 863, 865 (Fla. 1st DCA 1978). Dr. Delahay was not a signatory to the settlement agreement and, therefore, his interpretation or reinterpretation on what was meant to be inquired about in question two is irrelevant. Furthermore, Dows never agreed that O'Hara's desire to clear up his "confusion" concerning Dr. Delahay's report of August 1, 2000, would in any way alter or amend the settlement agreement.
We, therefore, find the trial court erred in compelling the $100,000 settlement and reverse the final order and direct the trial court to enter an order directing Nike to pay $300,000 to the Dows.
STONE and GROSS, JJ., concur.
NOTES
[1] Osteomyelitis is an infection of the bone.
[2] The parties agree that paragraph 5 has a typographical error in that it should refer to 4(a) and 4(b).