978 So.2d 873 (2008)
EMERALD POINTE PROPERTY OWNERS' ASSOCIATION, INC., Appellant,
v.
COMMERCIAL CONSTRUCTION INDUSTRIES, INC., Appellee.
No. 4D06-3767.
District Court of Appeal of Florida, Fourth District.
April 16, 2008.
*875 Tracy T. Segal of Akerman Senterfitt, West Palm Beach, and Katherine E. Giddings of Akerman Senterfitt, Tallahassee, for appellant.
Lynn G. Waxman of Lynn G. Waxman, P.A., West Palm Beach, for appellee.

ON MOTION FOR REHEARING
TRAWICK, DARYL E., Associate Judge.
We grant appellant's Motion for Rehearing, withdraw our previous opinion, and issue the following in its place.
Statement of Facts
Emerald Pointe is a senior citizens community consisting of both villas and condominium buildings. Appellant Emerald Pointe Property Owners' Association, Inc. (hereinafter referred to as Emerald Pointe POA) is responsible for maintaining all of the roofs in the Emerald Pointe community. On September 25, 1998, Emerald Pointe and Appellee Commercial Construction Industries, Inc. (hereinafter *876 referred to as CCI) entered into a five-year contract in which CCI agreed to perform roof maintenance, cleaning and repairs in Emerald Pointe. During the negotiation of the contract, the issue of whether hurricane damage would be covered was discussed; yet, the final version of the contract contained no such provision. Subsequently, CCI sent Emerald Pointe POA a document entitled "Roof Warranty," dated September 27, 1998 (two days after the contract was executed). This warranty was signed by a representative of CCI, but contained no signature or acknowledgement of any kind by Emerald Pointe POA. The warranty contained the following exclusion:
CCI will not warrant leaks or damages caused by: a) Natural Disasters including but not limited to floods, lightning, verifiable hurricanes, hail, earthquakes, verifiable tornados, dry rotted facia [sic  fascia], ect. [sic] b) Structural failures such as cracks in walls, partitions, foundations, windows, stoppage of roof drains or gutters, ect. [sic]
CCI shall not be liable for any interior or consequetial [sic] damages resulting from roof leaks (except when in the process of making a roof leak repair and it rains), termites, or other insects.
In September 1999, Emerald Pointe sustained roof damage as a result of Hurricane Irene. CCI notified Emerald Pointe POA that the contract did not cover roof damage caused by hurricanes. Emerald Pointe POA agreed to pay CCI a total of $6,250 to repair damaged roofs.
Upon the expiration of the original contract, a new contract between the parties was executed on January 5, 2004. The terms of the new contract were nearly identical to the 1998 contract, except for a few minor modifications. In the new contract, as in the first, CCI agreed to chemically pressure clean each unit's tile roof, clean gutters of debris, and keep the roofs free from fungus, mold and mildew during the five-year term. In consideration for CCI's repair and cleaning services, the Contract called for Emerald Pointe to make annual payments to CCI of $325 for each Villa-style building, $325 for each Town home-style building, and $265 for each Villa without a garage, totaling $48,655 for each year of the contract. As in the 1998 contract, there is no force majeur provision, nor did the contract specify what would happen if the leaks referenced in the contract resulted from a hurricane. However, as was the case after the 1998 contract was executed, a warranty which again excluded hurricane coverage was sent by CCI to Emerald Pointe POA after the contract was signed by both parties. The warranty was signed by CCI, but was not signed or in any way acknowledged by Emerald Pointe POA.
The provision of the contract at issue here, which deals with CCI's duty to repair roof leaks, states:
6) Each tile roof leak discovered will be repaired within 72 hours of notification, weather permitting or other acts beyond the control of CCI. Leak repairs include all water damaged sheathing, rafters, flashing and membrane materials. Leak repairs do not include repairs to drywall, paint, carpet or any other interior damages.
No issues arose under the contract until September 4, 2004. Up to that point, CCI had pressure cleaned the roofs and made five or six roof repairs each month. All payments by Emerald Pointe POA had been made on schedule. This all changed when Hurricane Frances carved its destructive path through South Florida. Emerald Pointe suffered extensive roof damage, resulting in multiple leaks that needed repair. Several days after the hurricane, CCI sent a fax to Emerald Pointe *877 POA, indicating that any repairs completed due to damage from the hurricane were not covered under the contract and would require additional compensation. Without any response to this fax by Emerald Pointe POA, CCI began repairs of the hurricane damaged roofs in Emerald Pointe. Emerald Pointe POA subsequently notified CCI that it would not pay CCI additional compensation for hurricane-related repairs, at which point CCI stopped work. Emerald Pointe withheld its quarterly payment to CCI due on October 1, 2004, believing that CCI was in breach of the contract by stopping the repair work. As a result, CCI filed the subject action for breach of contract against Emerald Pointe POA. A counter-claim was filed by Emerald Pointe POA against CCI, also for breach of contract.
At trial, CCI maintained that the term "leak repairs" in the roof maintenance contract was ambiguous. Emerald Pointe POA argued that the term was clear on its face, and that it should be given its plain meaning without any consideration of extrinsic evidence. The trial court agreed with CCI, finding that "leak" was undefined in the contract and was ambiguous, and admitted parol evidence to determine the intent of the parties in their use of the term. This evidence included:
1) the testimony of Mark Terlap, CCI's expert in roofing contracts, who testified that typical roofing industry maintenance contracts do not warranty damages resulting from hurricanes. Terlap also testified that, in his opinion, the contract did not cover hurricane damage.
2) the prior course of dealing of the parties under the 1998 contract, where hurricane damage had not been covered after Hurricane Irene.
CCI also presented the testimony of Anthony Amrhein, President of CCI, on the issue of damages. Amrhein testified that 35 units within Emerald Pointe were damaged by hurricanes, and that 51 leaks needed to be fixed. He indicated that, up to the point work by CCI was stopped, repairs totaled approximately $2000. No other evidence was introduced to support this conclusion. Amrhein also testified that CCI had cleaned 151 roofs for which it had not been compensated, and that CCI typically charged $495 per roof cleaning to parties not under a maintenance contract.
The trial court found that the parties had not intended that the term "leak" encompass damage caused by a hurricane, and that Emerald Pointe POA was in breach of the roof maintenance contract. The court awarded CCI $62,725 in damages.
Is the Term "Leak" as Used in the Subject Contract Ambiguous Requiring the Consideration of Parol Evidence?
Review of a trial court's finding that a term in a contract is ambiguous is de novo. Sugar Cane Growers Coop. of Fla., Inc. v. Pinnock, 735 So.2d 530, 534-35 (Fla. 4th DCA 1999). "[A]n appellate court is free to reassess the contract and arrive at a conclusion different from the trial court." Id. at 534.
Where contractual terms are clear and unambiguous, the court is bound by the plain meaning of those terms. The intent of the parties by their use of such terms must be discerned from within the "four corners of the document." Dows v. Nike, Inc., 846 So.2d 595, 601 (Fla. 4th DCA 2003). However, when contractual language is found to be ambiguous, extrinsic evidence may be considered by the court to ascertain the intent of the parties. Okeechobee Landfill, Inc. v. Republic Servs. of Fla., Ltd. P'ship, 931 So.2d 942, 945 (Fla. 4th DCA 2006). A contractual term may be found to be ambiguous if "it *878 is susceptible to more than one reasonable interpretation." Id. A trial court's finding that a term is ambiguous "should be sustained if supported by competent substantial evidence." Dinallo v. Gunster, Yoakley, Valdes-Fauli & Stewart, P.A., 768 So.2d 468, 471 (Fla. 4th DCA 2000).
The trial court below found that the term "leak" was ambiguous in its usage within the contract, reasoning that:
The contract does not make it clear whether "Each Leak" means including breaches or flaws outside those which roofing contractors normally repair as part of a general maintenance contract such as with hurricane damage which may result in breaches that can also be construed or defined as leaks. Additionally, the clause provides that the leak discovered "will be repaired within 72 hours weather permitting." Thus, a "leak" as used in this sentence may be construed differently from repairs which are the result of a hurricane in that after a hurricane there is usually apparent damage or [there is an] inspection specifically for hurricane damage[;] it [is] less usual that hurricane repairs [are] randomly "discovered."
The trial court thus focused on the phrase "each leak discovered" in the disputed provision, reasoning that while leaks caused by normal wear and tear are often "randomly discovered," leaks resulting from hurricane damage are "apparent" after the storm.
While there is logic in the trial court's reasoning, this Court instead looks to other language within the disputed provision to determine whether an ambiguity exists.
Paragraph 6 of the contract requires that each tile roof leak be repaired within seventy-two hours of notification (absent weather issues or acts beyond the control of CCI). While it is reasonable to conclude that leaks caused by normal wear and tear could be repaired within 72 hours of notification, it is likewise unreasonable to believe that multiple leaking roofs damaged as a result of a hurricane could be repaired within the same three days. After the 2004 hurricanes pummeled South Florida, the community's housing landscape was a patchwork design of blue tarps covering roofs waiting for repairs. Roofing contractors had huge backlogs as they worked to repair the heavy damage that had been inflicted throughout the area. Indeed, within Emerald Pointe itself, as noted earlier, there was extensive roof damage. Considering the seventy-two hour repair provision in this context, serious questions are raised as to whether the parties intended that leaks resulting from such cataclysmic events would be included within the scope of paragraph 6. Additionally, the use of the term "repaired" is subject to question. Did the parties intend that temporary or complete repairs were to be accomplished within the required seventy-two hours? As there is more than one reasonable interpretation of the terms "leak" and "repaired" under these circumstances, the intent of the parties cannot be clearly ascertained. Given the ambiguous nature of these terms, the trial court appropriately admitted extrinsic evidence of the common practice in local roof maintenance and repair contracts, as well as the parties' previous dealings, to determine the intent of the parties.[1]
*879 Was the Evidence Presented Legally Sufficient to Support the Award of Damages?
A trial court's award of damages must be affirmed if it is supported by competent substantial evidence. Alterra Healthcare Corp. v. Bryant, 937 So.2d 263, 266 (Fla. 4th DCA 2006), review denied, 956 So.2d 455 (Fla.2007). "`[T]he measure of damages for breach of a partially performed construction contract is, `either quantum meruit or the contractor's lost profit together with the reasonable costs of labor and materials incurred in good faith in the course of partial performance of the contract.''" Puya v. Superior Pools, Spas & Waterfalls, Inc., 902 So.2d 973, 975-76 (Fla. 4th DCA 2005) (quoting Nico Indus., Inc. v. Steel Form Contractors, Inc., 625 So.2d 1252, 1252 (Fla. 4th DCA 1993) (citation omitted)).
There is no evidence of lost profits in the record before this Court. Thus, any award of damages can be sustained only under a quantum meruit theory. Quantum meruit damages are designed to restore the contractor to the same position in which he would have been prior to making the agreement. Such damages are calculated by adding the reasonable value of the labor and services rendered, as well as materials furnished, id., and "must be proved with reasonable certainty and cannot be left to speculation or conjecture." Ballard v. Krause, 248 So.2d 233, 235 (Fla. 4th DCA 1971). "The contract price generally is the upper limit where the contractor sues in quantum meruit, but in the event the owner's breach is willful, the contractor may recover his outlay even if it exceeds the contract price." Id. at 234-35.
The trial court apparently awarded CCI $2000 for uncompensated hurricane damage repair.[2] However, there was no other evidence of repair costs admitted into evidence.[3] It appears that the court instead adopted CCI's calculations to determine damages, using the 151 roofs that were cleaned and not paid for, and assessed the $495 per roof CCI normally charged for parties not under a maintenance contract. It also appears that the trial court included a credit of $16,020 that was due to Emerald Pointe (this credit was never admitted into evidence), arriving at a final total of $62,725.[4]
CCI failed to prove the value of its labor, services and materials actually furnished to Emerald Pointe POA. Instead, CCI introduced evidence as to what it normally charged parties with whom it had no pre-existing maintenance contract  $495. This figure likely included a substantial amount of profit since, under the terms of its maintenance contract with Emerald Pointe POA, CCI charged only $325 or $265 (depending on the unit configuration) for cleaning and repair. Damages under a quantum meruit theory do not include profits. Given the lack of any other evidence, there was insufficient evidence to support a damage award. The judgment as to damages must therefore be reversed. Furthermore, CCI is not entitled *880 to a new trial on damages, as this would constitute a "`second bite at the apple at proving damages.'" T.A. Enters., Inc. v. Olarte, Inc., 951 So.2d 978, 979 (Fla. 4th DCA 2007) (quoting St. Petersburg Hous. Auth. v. J.R. Dev., 706 So.2d 1377, 1377 (Fla. 2d DCA 1998)); see also Teca, Inc. v. WM-TAB, Inc., 726 So.2d 828, 830 (Fla. 4th DCA 1999).
Conclusion
Accordingly, we affirm the trial court's determination that the contract provision at issue was ambiguous, as well as the court's admission of parol evidence to determine the parties' intent. However, the trial court's damage award is reversed. This cause is hereby remanded with directions to enter judgment for CCI in the amount of $2000.[5]
Affirmed in part; Reversed in part; and Remanded with Instructions.
STONE and STEVENSON, JJ., concur.
NOTES
[1] Emerald Pointe POA argues that, to the extent that there is any ambiguity in the contract, the ambiguity should be construed against the drafter, CCI. However, the rule of adverse construction is a "secondary rule of interpretation" or a "rule of last resort," which should not be utilized if the parties' intent can otherwise be conclusively determined. Sch. Bd. of Broward County v. Great Am. Ins. Co., 807 So.2d 750, 752 (Fla. 4th DCA 2002); DSL Internet Corp. v. TigerDirect, Inc., 907 So.2d 1203, 1205 (Fla. 3d DCA 2005); Child v. Child, 474 So.2d 299 (Fla. 3d DCA 1985).
[2] The Final Judgment does not indicate how the trial court determined its final damage award.
[3] Plaintiff's Exhibit 7 does list repair costs. However, this exhibit was used only as a demonstrative aid and was never admitted as substantive evidence.
[4] $2000 + (151 × $495) - $16,020 = $60,725. It is unclear from the record before us where the additional $2,000 in the trial court's award came from.
[5] The amount of uncompensated hurricane damage repair for which there was evidentiary support at trial.