JjDUFRESNE, Judge.
This case involves interpretation of an insurance policy covering the loss of the New Orleans Fair Grounds grandstand and adjoining buildings by fire on December 17, 1993. Because we agree with the trial judge that the policy was for scheduled, rather than blanket, coverage, we affirm that portion of the judgment limiting coverage as per the schedule of values on file with the insurer. However, because we find that liability for loss of business income was also limited to the 1.5 million dollars previously paid by the insurer, we vacate that portion of the judgment awarding the Fair Grounds an additional 2.4 million dollars over this amount for this item of claimed damages.
*1071 At the time of the fire, the Fair Grounds had in effect insurance totaling some thirty-four million dollars. The first five million was provided by Allianz Underwriters Insurance Company, the second five million by Royal Insurance Company of America, and the excess twenty-four million by Travelers Indemnity Company of Illinois. It was stipulated at trial that |gthe damage to the grandstand, furnishings, art work, loss of business, and other miscellaneous expenses totaled over thirty-four million dollars. Allianz and Royal each tendered the five million limits of their policies.
Travelers, for its part, contended that the insured value of the grandstand appearing on a schedule of values provided by the Fair Grounds was $16,617,273.00. Taking a credit for the underlying ten million dollar coverage paid by Allianz and Royal, it tendered $6,617,273.00 as its liability on the grandstand loss. It also paid an additional 2.85 million dollars for business loss, damage to art work and other miscellaneous property, and debris removal.
The Fair Grounds asserted instead that the policy was not limited by the schedule of values for the. individual items of property insured, but was rather a blanket policy which covered the total value of the loss, no matter which particular portions of the insured property were damaged. In effect, the Fair Grounds took the position that Travelers was liable to it for its whole twenty-four million dollar policy limit above the ten million paid by Allianz and Royal because .the actual damage caused by the fire exceeded thirty-four million dollars. Implicit in this argument is of course an admission by the Fair Grounds that the 16 million dollar stated value for the grandstand provided by it to Travelers was a gross underestimation of its actual replacement cost of over 30 million dollars.
There is no question here as to how the issue of scheduled versus blanket coverage arose. The evidence showed that the Fan-Grounds employed Powell Insurance Agency, Inc. to handle its insurance needs. Powell in turn dealt with Cooney, Rikard & Curtin, Inc. (CRC), an insurance broker, which in turn placed the coverage with the various insurers. The |scontract of insurance in effect from November 7, 1992, to November 7, 1993, the policy year prior to the one at issue here, was negotiated by Kathy Gambino of Powell through CRC, and provided 1.5 million of primary coverage by Allianz and 32.6 million in excess coverage by Travelers.
In the application for this prior policy Gambino listed values for 66 pieces of property, the first of which was 15.1 million for the grandstand. At the end of that list was a loss of earnings value at the grandstand itself of 1.5 million dollars. An additional page showed the insured values for the four off track betting parlors owned by the Fair Grounds, and the loss of business income values for each of them, which latter amounts totaled 4.7 million dollars, thus making a listed grand total of 6.7 million for all items of lost income. The application also contained a list of art work values and a list of equipment values. These listed values were submitted to Travelers and became a part of their file for the policy.
The underlying Allianz policy for this previous year contained an occurrence limit of liability endorsement which stated:
2. The premium for this policy is based upon the statement of values on file with the company or attached to this policy. In the event of loss hereunder, liability for the company shall be limited to the least of the following:
(B) The total stated value for the property involved as shown on the latest statement of values on file with the company, less applicable deductable(s).
The Travelers excess policy contained a similar loss payment clause which stated:
Liability under our policy for our share of the “Ultimate Net Loss” shall not attach until the underlying insurer(s) have paid, admitted liability for, or have *1072 been held legally liable for the full amount of their respective participations of the “Ultimate Net Loss.” But, in no event, shall the “Ultimate Net Loss” exceed the lesser of the following:
kb. Total Stated Value for the property lost or damaged, as shown on the latest statement of values on file with us.
It is undisputed here that the above references to “statements of values on file with us” mean that these were scheduled, rather than blanket, policies. That is, in the event of loss of a listed property, the insurers would only pay the value stated for that item on the file list, even if the item were actually worth more than its listed value.
Several months after these policies were in effect, Travelers had the grandstand inspected and became concerned that the listed value for the building was too low. Initially, it indicated that it would cancel the policy unless an appraisal were done by the Fair Grounds to establish the actual value of the building. For reasons not clear in the record, it eventually took the position that it would keep the policy in effect until its expiration date of November 7,1993, but would not renew it without certain changes.
During the above discussions, Loti Woods of CRC was handling the file and had made Powell aware of the possibility that Travelers might not agree to a renewal, although she hoped she could convince them to do so. As the expiration date approached, Gambino of the Powell agency prepared another list of property values for submission with a renewal application. This document consisted of a cover sheet and a three page statement of values which was basically a retyped list of the 66 properties, beginning with the grandstand, that had been submitted with the previous year’s application, but with each of the stated values raised by 10%. The new value given for the grandstand was $16,-617,273.00. The itemized loss of business income for each of the off track betting parlors (totaling 4.7 million and numbered 67-70 on this new list) also appeared on the three |5page list, but the 1.5 million figure for loss of business income at the grandstand did not. Instead that latter amount appeared on the cover sheet, which bore the caption “Fair Grounds Corporation, Blanket Building and Contents.”
Documents at CRC indicated that by the fall of 1993, Travelers was still uncertain as to whether it would renew the excess coverage policy. On October 13, 1993, Woods sent a renewal proposal to Travelers which listed the values to be insured. Buildings and contents were listed on the proposal at 27 million, fine arts and equipment at about Hl million each, and business interruption at 6.2 million. Attached to this proposal were the last three pages of Gambino’s new list of 66 properties, and the loss of income figures for each of the betting parlors, but without the cover sheet. No schedules of the fine arts and equipment values were attached, apparently in reliance on the prior years schedules already in Travelers’ files. The business interruption coverage of 6.2 million was evidently based on the previous years amounts of 1.5 million at the grandstand' and the 4.7 million total at the betting parlors. However, as noted above, the three pages of Gambino’s new list showed only the 4.7 million figure, not the 1.5 million figure. Based on this information, Travelers quoted a premium for the renewal coverage and sent it to Woods.
Upon receiving Travelers’ quote, Woods faxed it to Gambino on November 4, 1993, on a CRC form with the following information:
Interest: Real & personal property including] B[usiness] I[ncome], Fine Arts, & Contractors’] Equipment] as per schedule on file.
All other terms & cond[tions] the same as expiring.
The Fair Grounds accepted this basic quote. On November 5, a binder |fiwas requested from Travelers, and on Novem *1073 ber 11, Woods sent a confirmation of this binder to Gambino.
The primary Allianz policy and the Travelers excess policy were issued, and both contained the exact language found in the previous year’s policies as to scheduled values on file. Tom Lemire, the person with whom Woods dealt at Travelers, testified that Travelers had provided scheduled coverage to the Fair Grounds for the past several years, and that he treated the renewal application for the T993-94 year as one for this same type of coverage. He said that he was never asked for a quotation for a blanket policy, and had he been he would have rejected such coverage outright for this particular risk. He further testified that the policy which was issued was unquestionably a scheduled policy, and that its terms and conditions were the same as for the previous years, with the exception of the 10 million dollar underlying coverage, and the 10% increase in the values of the properties on the 66 item list. He acknowledged that the 1.5 million figure for business income loss at the grandstand, which appeared on the previous year’s 66 item list on file, did not appear on the new 66 item list, but he nonetheless assumed that this 1.5 million value was still a part of the 1993-94 application when he quoted the premium and approved the policy.
After the fire, Travelers deducted the 10 million underlying coverages and paid the Fair Grounds according to the schedules on file as follows:, $6,617,273 for the grandstand, $430,390 for fine arts, $290,-893 for other property, and $1,500,000 for lost income at the Fair Grounds grandstand location. It also paid $640,234 for debris removal under an unscheduled loss endorsement on the policy.
I/The Fair Grounds claimed that' although the policy as written is admittedly a scheduled policy, it should be interpreted as a blanket policy because 1) Woods was Travelers agent, and her apparent negligence in not sending the cover sheet seeking blanket coverage should redound to Travelers’ disadvantage, and 2) Travelers’ failure to attach all schedules on file to the policy, as per La. R.S. 22:628, precludes it from limiting its liability as per those schedules.
Travelers refused to pay any additional amounts and the Fair Grounds brought the present action to recover up to the 24 million limit of Travelers’ coverage. It also sued Powell for failing to place the blanket coverage. Powell in turn filed a third party demand against CRC for its part in failing to place the requested coverage. However, prior to trial the Fan-Grounds entered into a Mary Carter agreement with both Powell and CRC, and these two parties were dismissed from the case.
After a bench trial, the trial judge determined that Woods was in fact the agent of the Fair Grounds rather than Travelers, that La. R.S. 22:628 did not require attachment of the schedules to the- policy, and therefore that the policy should be interpreted as written to provide only scheduled coverage. He also determined, however, that because the 1.5 million figure for lost income at the grandstand had not been included in the schedule submitted with the 1993-94 renewal application, this limit did not apply and that Travelers was liable for the total lost income of 3.9 million. He therefore awarded the Fan-Grounds the difference between the total loss and the 1.5 million already paid, or $2,410,905. The Fair Grounds now appeals that portion of the judgment limiting its recovery to the scheduled values, and Travelers appeals that portion of the judgment | ¡¡awarding the Fair Grounds the 2.4 million in additional lost earnings.
There is no question here that the insurance contract at issue is a “scheduled,” rather than a “blanket,” policy. Thus, Travelers’ liability for any covered losses is limited to the value of the lost property appearing in the itemized lists of values sent to it by the insured. The value of the grandstand given by the Fairgrounds in the list of properties sent to Travelers was *1074 $16,617,273. After deducting the 10 million primary coverage provided by Allianz and Royal, Travelers paid the remaining $6,617,273 of the given value. This amount was proper under the terms of the policy.
Travelers also paid $1,500,000 for loss of business at the grandstand based on this amount as stated in its files from the previous year’s submission, even though this item was not directly included in the renewal proposal sent by Woods on October 13, 1993. That proposal did, however, give a total of 6.2 million for business loss, but only itemized 4.7 million for the betting parlors in the attached documents, thus leaving un-itemized the 1.5 million for the grandstand loss.
The trial judge concluded from the above circumstances that the failure to specifically list the 1.5 million for grandstand losses in the renewal papers meant that there was no scheduled limit for the amount of this loss. Based on evidence that the business loss at the grandstand was actually about 3.9 million, he awarded that amount, with credit for sums already paid. Travelers urges here that this was error, and we agree.
Under a scheduled policy only listed risks are insured, and then only for the listed value. In this case, if only the renewal papers were to be considered, there would be no coverage whatsoever for the grandstand |abusiness losses because that risk was not specifically listed in those papers. However, Travelers did not attempt such a constricted reading of the policy, but instead construed the language regarding the “latest statement of values on file with us” as meaning that previously listed risks were also covered in the renewal policies based on the prior values in the file. We also note that the renewal was issued by Travelers on the same terms and conditions as the previous year’s policy, except for two changes: there was an increase in the underlying primary coverage to 10 million dollars, and there was an increase in the listed values for items on the 66 property list. Because the renewal policy thus continued in effect coverage at the 1.5 million value for the grandstand losses, that is the maximum amount for which Travelers is liable under this policy. We therefore set aside the judgment of the district court in so far as it awarded any amounts above this 1.5 million dollar limit for grandstand losses.
The Fair Grounds, for its part, seeks recovery of the entire 24 million dollar limit of the Travelers policy. Its first argument is that Woods of CRC was Travelers’ agent, that her alleged negligence in not sending the blanket coverage request appearing on the cover sheet of Gambino’s new list of values to Travelers is attributable to Travelers, and therefore that the policy which issued should be construed as a blanket policy. The trial judge rejected this argument, and determined Woods was actually an agent of the Fair Grounds, rather than Travelers.
At the time this litigation arose La. R.S. 22:1162 (now amended and renumbered as La. R.S. 22:1112) defined an insurance broker as follows:
An ‘insurance broker’ is hereby defined to be an individual, partnership, or corporation who or which shall, for a commission or brokerage consideration, act for or aid in any manner in negotiating | mcontracts of insurance, or in placing risks or soliciting or effecting insurance as agent for an insured or prospective insured other than himself or itself, and not as a licensed agent of an insurer, and not as an insurance solicitor employed by a licensed agent. The broker is deemed for all purposes to be the representative of the insured. However, when the insurance broker has the authority to bind the insurer in an insurance contract, then the broker shall be deemed to be the representative of the insurer and not the insured, (emphasis added)
During that same period, La. R.S. 22:1161 (now amended and renumbered as *1075 La. R.S. 22:1112) defined an insurance agent pertinently as follows:
An insurance agent is hereby defined to be an individual ..., partnership ..., or corporation ..., authorized in writing by any insurer lawfully authorized to transact business in this state, to act as its representative with authority to solicit, negotiate and effect contracts of insurance on its behalf.... (emphasis added)
The jurisprudence interpreting these insurance code statutes prior to their amendment was reviewed in Smason v. Celtic Life Ins. Co., 615 So.2d 1079 (La.App. 4th Cir.1993), writ denied 618 So.2d 416 (La.1993). That jurisprudence was to the effect that while the statutes raised a presumption that the broker represented the insured and the agent represented the insurer, there could be special factual circumstances in any particular case which would lead to treating a broker as an agent of the insurer. In the present case, there is no dispute that CRC was an insurance broker, and the evidence showed conclusively that it was not authorized to bind Travelers to any contract of insurance, or to solicit, negotiate, or effect contracts of insurance for Travelers. Thus, under the provisions of the insurance code CRC was clearly representing the insured in this matter.
The next inquiry must therefore be whether any circumstances existed in the transaction which would lead to a different result. In Tiner v. Aetna Life Insurance Co., 291 So.2d 774 (La.1974), the court identified some of these factors, quoting with approval 3 Couch on Insurance 2d, Section 26:25, pp. 481-82 (1960):
[I]f one purporting to act as an agent receives an application, accepts the premium, secures and delivers the policy, and does everything necessary to attachment of the risk, the insured may assume that he is the properly authorized agent of the insurer.(at 777)
The court also noted that another important factor was whether the application form used was supplied by the insurer.
Here, the evidence showed that CRC never purported to act on behalf of Travelers and Kathy Gambino at the Powell Agency knew full well that Woods could not issue the policy on travelers’ behalf. As to securing the contract, CRC never represented that it could “secure” .the policy, and again Gambino knew full well that issuance of the renewal was solely at the discretion of Travelers. It is not clear from the record who actually delivered the policy to the insured. While it appears that CRC did accept the premiums, the insurance code, La. R.S. 22:1180 (now La. R.S. 22:1118), specifically authorized the collection of premiums by a broker, and further specified that this practice did not otherwise create an agency relationship, see Jackson & Jackson v. La. Offshore Insurance Agency, Inc., 508 So.2d 875 (La.App. 5th Cir.1987). While the phrase “does everything necessary to attachment of the risk” is somewhat vague, the essential act in insuring any risk is a binding acceptance of that risk by the insurer. There is no question here that CRC could not bind this policy for Travelers, and that Gambino knew this. Finally, CRC did not use any application form provided to it by Travelers. Considering all of the above evidence bearing on the factors identified in Tiner, supra, it is evident that |1?CRC was not an agent of Travelers in this transaction, and therefore that any negligence on its part can not be attributed to Travelers. We therefore affirm the trial judge’s rejection of this claim by the Fair Grounds.
 The final issue concerns application of La. R.S. 22:628, which states:
No agreement in conflict with, modifying, or extending the coverage of any contract of insurance shall be valid unless it is in writing and physically made a part of the policy or other written evidence of insurance, or it is incorporated in the policy or other written evidence of insurance by specific reference to another policy or written evidence of *1076 insurance. This Section shall not apply to contracts as provided in Part XV of this Chapter.
The provisions of this Section shall apply where a policy or other written evidence of insurance is coupled by specific reference with another policy or written evidence of insurance in existence as of the effective date hereof or issued hereafter. Any agreement in conflict with, modifying, or extending the coverage of any contract of insurance shall be deemed to be physically made a part of a policy or other written evidence of insurance, within the meaning of this section, whenever such written agreement makes reference to such policy or evidence of insurance and is sent to the holder of such policy or evidence of insurance by United States mail, postage prepaid, at such holder’s last known address as shown on such policy or evidence of insurance or is personally delivered to such holder.
In Lindsey v. Colonial Lloyd’s Insurance Co., 595 So.2d 606 (La.1992), the court noted that the legislative policy underlying this statute is to prevent an insurer from limiting or modifying the terms of a policy as written and then urging that limitation or modification as a defense to coverage, all without providing the insured with written evidence of such asserted limitation or modification.
Here, the trial judge determined that La. R.S. 22:628 was not applicable in this case for two reasons. First, he noted that in Wannage v. Employer’s Ins. Of Wausau, 386 So.2d 1076 (La.App. 3rd Cir.1980), the court ruled the statute inapplicable where a policy provided coverage for | ^corporate directors and officers, but did not have attached to it a list of the names of these people. Its analysis was that these names were readily ascertainable, and moreover they appeared in the corporation’s own documents and were thus well known. He also noted Lindsey v. Colonial Lloyds’s Insurance Co., supra, in which the court similarly ruled the statute inapplicable where the unattached document was a car rental agreement. There, the rental agreement was found not to conflict with the underlying policy. The court also noted that, as in Wannage, the document in question “merely filled the interstices of the policy (at 612),” rather than altering or limiting coverage, thus further rendering the statute inapplicable.
Based on the above eases, the trial judge determined that the statute did not require that the schedules of value be attached to the policy. Alternatively, he stated that even were the statute applicable, its provision that other documents could be incorporated by reference was met here. He cited the policy language about “the latest statement of values on file with us” as sufficient to constitute incorporation by reference. We agree with both his reasons and conclusions.
There was no assertion here by Travelers of any limitation or modification of coverage from that set forth in the policy of insurance. As noted above, the policy itself contained language which unequivocally identified it as providing “scheduled” coverage.” It was further shown that this was the exact type of coverage that had been provided by Travelers to the Fair Grounds for the prior several years, and there was no evidence to suggest that Travelers had ever provided anything but scheduled coverage. Moreover, there is no dispute here that the Fair Grounds prepared the schedules listing the properties to be insured and theirj^individual values. Finally, the evidence established that on November 4, 1993, Woods sent to Gambino Travelers’ quotation for coverage specified “as per schedule on file” and further noting that “all other terms & conditions] the same as expiring.” It was this quotation which the Fair Grounds accepted and the policy was issued under these precise terms. In these circumstances, the trial judge correctly ruled that based on the above cases the statute was inapplicable and, alternatively, that even were it applicable the insurance policy was *1077 in compliance with the “incorporation by reference” clause of the statute. We therefore affirm those rulings.
For the foregoing reasons, we delete that portion of the judgment awarding the Fair Grounds $2,410,905.00 for business loss at the grandstand. In all other respects the judgment is affirmed.

JUDGMENT AMENDED AND AFFIRMED AS AMENDED.