DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**LANDMARK AMERICAN INSURANCE COMPANY,**
Appellant,

v.

**PIN-PON CORPORATION** and **LEXINGTON INSURANCE COMPANY,**
Appellees.

Nos. 4D12-3997 & 4D12-4002

[January 7, 2015]

Consolidated appeal from the Circuit Court for the Nineteenth Judicial Circuit, Indian River County; James W. Midelis, Judge; L.T. Case Nos. 31 2009 CA 01 2244 and 31 2009 CA 01 00320.

Scott J. Frank and Jared M. Krukar of Butler Pappas Weihmuller Katz Craig LLP, Tampa, for appellant.

Curtis B. Miner and Barbara A. Silverman of Colson Hicks Eidson, Coral Gables, and Stephen A. Marino, Jr., and Rochelle N. Wimbush of Ver Ploeg & Lumpkin, P.A., Miami, for appellee.

TAYLOR, J.

Appellant Landmark American Insurance Company, an excess insurer, appeals an amended final judgment awarding the insured, Pin-Pon Corporation, over $5.8 million for breach of the excess insurance policy. The insurance claims arose from extensive hurricane damage to the insured's hotel as a result of Hurricanes Frances and Jeanne. We reject Landmark's argument concerning the proper interpretation of the primary policy. We reverse, however, for a new trial as to code upgrade damages, concluding that the trial court erred in admitting the insured's Exhibit 98 as a business record.[1]

---

[1] Without further comment, we conclude that the trial court properly denied Landmark's motion for partial directed verdict on code upgrade damages and that the trial court did not abuse its discretion in denying the motion for new trial as it pertains to additional building damages awarded as a result of Hurricane Frances. We also note that any other issues not specifically addressed in this opinion are either moot or without merit.

*Factual Background*

In June 2004, Pin-Pon purchased the Palm Court Hotel. At the time of the purchase, Pin-Pon intended to perform renovations to improve the hotel, but planned to keep the hotel open during the renovation process. In September 2004, however, Hurricane Frances and Hurricane Jeanne struck South Florida, causing damage to the hotel before any renovations had commenced.

Pin-Pon insured the Palm Court Hotel under a primary commercial property insurance policy it held with Lexington Insurance Company. The Lexington policy provided a per-occurrence "Limit of Insurance" of $2,500,000. The declarations page of the Lexington policy does not list any "aggregate limit"[2] of insurance.

Endorsement #2 of the Lexington policy added the Palm Court Hotel to the schedule of locations. Endorsement #2 further states:

> AMOUNT OF INSURANCE:
> BUILDING: $8,000,000
> CONTENTS: $2,000,000
> BUSINESS INCOME: $1,382,368

The trial court found that the Lexington policy was ambiguous and construed it as a blanket $2.5 million policy with no sublimit of liability for each category.

Additionally, Pin-Pon insured the hotel under an excess commercial property insurance policy it held with Landmark. The Landmark policy is a form-following excess policy under which Landmark's liability is subject to the same terms and conditions of the Lexington Policy, unless modified by the Landmark policy. Under the Landmark policy, the scheduled limit of liability for each scheduled item of property is as follows: $8,800,000 for the building; $2,200,000 for personal property; $1,520,604.80 for business income; and $2,500,000 for code upgrade coverage.

---

[2] An aggregate limit of insurance defines an insurer's total liability under a policy regardless of the number of claims and occurrences. *Ins. Corp. of Am. v. Dillon, Hardamon & Cohen*, 725 F. Supp. 1461, 1466–67 (N.D. Ind. 1988). With limited exceptions, the Lexington policy contains per-occurrence limits of liability but does not contain aggregate limits of liability.

2

Pin-Pon submitted claims to both Lexington and Landmark for damages arising from Frances and Jeanne. During the claim adjustment process, Lexington paid Pin-Pon the full $2.5 million policy limits with respect to the Frances claim, and paid $533,924.12 with respect to the Jeanne claim. Landmark paid Pin-Pon $2,059,893.43 on the Frances claim, but paid nothing on the Jeanne claim, given that Lexington had not yet paid its policy limits under the primary policy with respect to that claim.

Pin-Pon disagreed with its insurers over what additional amounts were due under the policies. Pin-Pon brought a breach of contract action in February 2009 against Landmark in connection with the Frances claim, and brought a separate breach of contract action in September 2009 against both Landmark and Lexington in connection with the Jeanne claim. The trial court later consolidated the two cases for purposes of trial.

After a three-week trial, the jury returned a verdict finding that Pin-Pon was entitled to $902,933.40 in additional building damages and $1,499,949.30 in additional code upgrade damages resulting from Hurricane Frances. The jury also found that Frances had caused 15 months of business interruption, and that Jeanne had caused 3 months of business interruption. Based on the parties' stipulation as to the monthly amount of business interruption damages, the total business interruption damages from Frances totaled over $3.6 million. The trial court's interpretation of the primary policy allowed Pin-Pon to allocate the entire $2.5 million per occurrence limits of the Lexington policy to the business interruption award for Frances.

The court denied Landmark's post-trial motions and entered an amended final judgment in favor of Pin-Pon in the amount of $5,827,306.66 plus attorney's fees and costs. This appeal ensued.

### Interpretation of the Primary Policy

On appeal, Landmark first claims that the trial court erred when it permitted Pin-Pon to allocate the entire insurance proceeds from the Lexington policy to the business income award. Landmark argues that the insurance policies unambiguously established the maximum amount Pin-Pon could recover for three categories of damages, including business interruption damages. Specifically, Landmark argues that the Lexington primary policy set a business income coverage limit of $1,382,368.

In response, Pin-Pon argues that the trial court properly allowed it to allocate the proceeds of its primary insurance policy with Lexington so as

3

to maximize recovery under the excess policy. Specifically, Pin-Pon contends that the Lexington policy did not establish sublimits of insurance for specific types of damage. Pin-Pon maintains that when the Lexington policy is construed so as to give effect to all of its provisions, it is clear that the Lexington policy was a blanket policy of $2,500,000 and that the values in Endorsement #2 did not limit the coverages provided. Finally, Pin-Pon argues that to the extent there was any ambiguity in the policy, it was properly resolved in favor of the insured so as to provide the greatest amount of coverage.

Because the interpretation of an insurance contract presents a question of law, an appellate court applies a de novo standard of review. *Arias v. Affirmative Ins. Co.*, 944 So. 2d 1195, 1197 (Fla. 4th DCA 2006).

An insurance contract must be construed in accordance with the plain language of the policy. *Swire Pac. Holdings, Inc. v. Zurich Ins. Co.*, 845 So. 2d 161, 165 (Fla. 2003). "[I]n construing insurance policies, courts should read each policy as a whole, endeavoring to give every provision its full meaning and operative effect." *Auto-Owners Ins. Co. v. Anderson*, 756 So. 2d 29, 34 (Fla. 2000). Indeed, section 627.419(1), Florida Statutes (2004), requires that "[e]very insurance contract shall be construed according to the entirety of its terms and conditions as set forth in the policy and as amplified, extended, or modified by . . . any rider or endorsement thereto."

If the terms of a contract are clear and unambiguous, the court is bound by the plain meaning of those terms. *Emerald Pointe Prop. Owners' Ass'n v. Commercial Constr. Indus., Inc.*, 978 So. 2d 873, 877 (Fla. 4th DCA 2008). Thus, where a contract is unambiguous, the parties' intent must be gleaned from "the four corners of the document." *Dows v. Nike, Inc.*, 846 So. 2d 595, 601 (Fla. 4th DCA 2003). "In the absence of ambiguity, the language itself is the best evidence of the parties' intent and the plain meaning controls." *Id.*

If, however, the relevant policy language is susceptible to more than one reasonable interpretation, one providing coverage and another limiting coverage, the policy is ambiguous. *Auto-Owners*, 756 So. 2d at 34. Where policy language is ambiguous, it "should be construed liberally in favor of the insured and strictly against the insurer." *State Farm Fire & Cas. Co. v. CTC Dev. Corp.*, 720 So. 2d 1072, 1076 (Fla. 1998). Moreover, a court may consider extrinsic evidence to clarify the meaning of an ambiguous contract. *Gorman v. Kelly*, 658 So. 2d 1049, 1052 (Fla. 4th DCA 1995).

The resolution of this point on appeal turns on whether the primary policy is a blanket policy or a scheduled policy. "A distinction must be

made between a policy which speaks in terms of a lump-sum obligation or value of the property and one which separately schedules different items of property."  12 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* § 175:90 (3d ed. 2014).

The essence of a blanket policy "is that it invariably attaches to, and covers to its full amount, every item of property described in it."  *Id.* at § 177:72.  "If the loss upon one item exhausts the full amount of the policy, the whole insurance must be paid and there can be no apportionment of it."  *Id.*

By contrast, in the case of a scheduled policy, "each separately treated item of property is in effect covered by a separate contract of insurance and the amount recoverable with respect to a loss affecting such property is determined independently of the other items of property."  *Id.* at § 175:90.

Here, as noted above, Endorsement #2 of the Lexington policy added the Palm Court Hotel to the schedule of locations, and further states:

> AMOUNT OF INSURANCE:
> BUILDING:              $8,000,000
> CONTENTS:              $2,000,000
> BUSINESS INCOME:       $1,382,368

Paragraph 36 of the Lexington policy states that "[t]he values and schedule of property declared to [Lexington] at the inception of the policy are for premium purposes only and shall not limit the coverages provided by this policy."

The "Occurrence Limit of Liability" provision of the Lexington policy states:

> It is understood and agreed that the following special terms and conditions apply to this policy:
>
> 1. The limit of liability or Amount of Insurance shown on the face of this policy, or endorsed onto this policy, is the total limit of [Lexington's] liability applicable to each occurrence, as hereafter defined.
>
> * * *
>
> 2. The premium for this policy is based upon the Statement

5

of Values on file with [Lexington] or attached to this policy. In the event of loss hereunder, liability of [Lexington], subject to the terms of paragraph one (1) above, shall be limited to the least of the following:

    a. The actual adjusted amount of loss, less applicable deductible(s).

    b. The total stated value for the property involved, as shown on the latest Statement of Values on file with [Lexington], less applicable deductible(s).

    c. The limit of Liability or Amount of Insurance shown on the face of this policy or endorsed onto this policy.

Occurrence Limit of Liability Form PR9014 (01/91) (inconsistent capitalization in original).

Endorsement #4, however, deleted the limitation in paragraph 2.b. of the Occurrence Limit of Liability form. Endorsement #4 states:

In accordance with the terms and conditions of the policy, it is hereby understood and agreed that the following changes are made to the policy:

1) Occurrence Limit of Liability, Form No. PR9014 (01/91), Clause 2, Item B, is deleted.

When the Lexington policy is construed as a whole, the only way to harmonize these provisions is to conclude that the policy is a blanket policy with a total limit of $2,500,000 per occurrence and no sublimit for business income damages. We find that the "Amount of Insurance" figures in Endorsement #2 must refer to the values declared to Lexington at the inception of the policy, and do not set specific caps on the amount of coverage for the three categories.

This interpretation is supported by Endorsement #4, which expressly eliminated the stated values as a limitation of liability under the policy. Normally, insurers rely upon paragraph 2.b. of the Occurrence Limit of Liability form when arguing that a policy is a scheduled, rather than blanket, policy. *See, e.g., Fair Grounds Corp. v. Travelers Indem. Co. of Ill.*, 742 So. 2d 1069, 1072 (La. Ct. App. 1999) ("It is undisputed here that the above references to 'statements of values on file with us' mean that these were scheduled, rather than blanket, policies."). Endorsement #4 was

6

undoubtedly intended to change the meaning of the policy by deleting paragraph 2.b. from the Occurrence Limit of Liability form. Interpreting the policy as a scheduled policy would fail to give any meaning or effect to Endorsement #4.

The fact that Endorsement #2 of the Lexington policy lists a business income value of $1,382,368 as the "Amount of Insurance" does not mean that this figure is a sublimit of liability for business income damages. Paragraph 36 of the policy specifically states that the values and schedule of property declared to Lexington "are for premium purposes only and shall not limit the coverages provided by this policy."

Nor does paragraph 2.c. of the Occurrence Limit of Liability form mean that the policy is a scheduled policy with sublimits of liability for each category of property set forth in Endorsement #2. Under paragraph 2 of the Occurrence Limit of Liability form, Lexington's liability for a loss was limited to the least of: "a. The actual adjusted amount of loss, less applicable deductible(s). . . . [or] c. The Limit of Liability or Amount of Insurance shown on the face of this policy or endorsed onto this policy."

Paragraph 2.c., however, must be interpreted in light of Paragraph 1, which states that "[t]he limit of liability or Amount of Insurance shown on the face of this policy, or endorsed onto this policy, *is the total limit* of [Lexington's] liability applicable to each occurrence . . . ." (Emphasis added).

Under paragraph 1, the phrase "[t]he limit of liability or Amount of Insurance" refers to the "*total limit* of . . . liability applicable to each occurrence." The phrase refers to a single, total limit of liability; it does not refer to separate limits of liability for each category of insurance. Moreover, because paragraph 2.c. mirrors the language of paragraph 1, the phrase "limit of liability or Amount of Insurance" in paragraph 2.c. must mean the same thing as the identical language in paragraph 1.

We conclude that paragraph 2.c. is necessarily referring to the policy limit of $2.5 million, which is *the total limit* of Lexington's liability applicable to each occurrence. In other words, paragraph 2.c. does not operate as a scheduled policy with limits of insurance based on the "Amount of Insurance" figures in Endorsement #2.

The problem with interpreting the "Amount of Insurance" values in Endorsement #2 as being equivalent to the "limit of Liability or Amount of Insurance" referenced in paragraph 2.c. is that this interpretation would have the absurd result of increasing the building insurance to $8 million

per occurrence. If Landmark's interpretation were correct, the policy would be a scheduled policy, which would mean that each separately treated category in Endorsement #2 would in effect be covered by a separate contract of insurance with independent limits of $8 million for the building, $2 million for the contents, and $1,382,368 for business income. Applying Landmark's logic, the $8 million value in Endorsement #2 would be the "Amount of Insurance" for the building that was "endorsed onto this policy." Therefore, following Landmark's interpretation to its logical conclusion, the $2.5 million per-occurrence limit of the Lexington policy would be superseded by the figures in Endorsement #2 and would no longer operate as the total limit of Lexington's liability. Such an interpretation cannot be accepted.

When the Lexington policy is read as a whole, giving every provision its full meaning and operative effect, we conclude that the Lexington policy unambiguously provides a blanket limit of $2,500,000 per occurrence with no sublimit for business income damages. Interpreting the Lexington policy as a blanket policy risks the least variation to the policy as a whole.

At a minimum, the insured's interpretation of the Lexington policy as a blanket policy is reasonable. Thus, even if Landmark's interpretation of the Lexington policy were also a reasonable one, the policy would be ambiguous and should be interpreted in the insured's favor.

Moreover, assuming the policy were ambiguous, extrinsic evidence supports the insured's interpretation of the Lexington policy. In response to a request for admissions, Lexington admitted that "the 'Amount of Insurance' values, designated in Endorsement [#2] of Lexington Policy for the property . . . do not operate as limits of liability with respect to each of the coverages for Building, Contents and Business Income." Lexington further admitted that its policy provided a "blanket limit of $2,500,000 per occurrence" and that Endorsement #2's "Schedule of Locations" had no bearing on the coverage, as it was "showing the value at the location for rating and not the amount of coverage." While Landmark is certainly not bound by Lexington's admissions in the litigation, Lexington's admissions do provide extrinsic evidence of the parties' intent as to the scope of coverage of the primary policy.

In short, we affirm the trial court's conclusion that the Lexington policy was a blanket policy with a $2.5 million per-occurrence limit and no sublimits.[3]

---

[3] Even if the trial court improperly relied upon Lexington's discovery responses in order to find the policy ambiguous, this court may affirm the trial court's

8

### *Improper Admission of Exhibit 98*

Pin-Pon's Exhibit 98 is the revised 2004 Hurricane Damage/Code Upgrade Insurance Claim which Pin-Pon submitted to Landmark and Lexington in support of its claim for code upgrade damages resulting from Hurricanes Frances and Jeanne. A representative of Pin-Pon complied the exhibit. Exhibit 98 is a compilation of over 20 documents.

The first part of Exhibit 98 is a cover executive summary prepared by Pin-Pon, addressing matters for which the insurers requested additional clarification. The next part of Exhibit 98 is a code upgrade analysis performed by Pin-Pon's architect. The code upgrade analysis had already been admitted into evidence without objection as Plaintiff's Exhibit 71. The code upgrade analysis sets forth the repairs required under the 2004 Florida Building Code, assuming that the property were put back to its pre-storm condition without any other modifications. However, Exhibit 71 did not set forth the total cost of the repairs.

The primary point of contention concerning the admissibility of Exhibit 98, however, was a costing analysis performed by Pin-Pon's general contractor. The main document in Exhibit 98 regarding the cost of the code upgrades is a five-page spreadsheet, prepared by the contractor, titled "Cost for Code Upgrades Based on 'Put Back' to Pre-Strom Condition." Apart from the contractor's code upgrade cost spreadsheet, the remaining documents in Exhibit 98 consisted largely of subcontractor invoices, subcontractor proposals, and governmental permit documents.

Pin-Pon sought to admit Exhibit 98 through the testimony of the architect. The architect testified that in the normal course of business, he gives his report to a contractor or a cost consultant to obtain pricing for a project. He explained that the numbers he obtains from a contractor or cost consultant are reliable and that he depends upon them in the normal course of business. He further testified that Pin-Pon's representative obtained the cost estimates from the contractor for the items in the code upgrade letter, as is normally done in the course of his business. He stated that he maintained a copy of this report in his records, it was part of his business practice "to maintain reports like this one" in his records, and that the numbers obtained were reliable within the industry. He admitted

---

ultimate conclusion. *See Dade Cnty. Sch. Bd. v. Radio Station WQBA*, 731 So. 2d 638, 644 (Fla. 1999) (if a trial court reaches the right result but for the wrong reason, an appellate court may uphold the ruling if there is any basis to support the judgment in the record).

that all the documents in Exhibit 98, with the exception of one, were created by individuals outside his firm.

The trial court then questioned the architect as to how his firm acquired the documents. The architect explained that normally in the course of business, his firm would prepare drawings or "a scope of work" regarding the code upgrade. Those documents would be given to the contractor. The contractor would prepare the cost estimates and then those would be brought back to his firm for it to review. The architect testified that these documents were the type of records that his company would ordinarily maintain and that they were kept in the ordinary course of business. He elaborated that the reasons his firm kept the documents were because: (1) his firm was required by law to maintain all its records for seven years; and (2) his firm was responsible to the owner for the project, so he needed to be kept in the loop on costs and needed to keep the documents in the file for reference purposes.

The trial court ruled that Exhibit 98 was a business record, and admitted it into evidence over Landmark's hearsay objection. Relying on Exhibit 98, the architect testified that the total pricing for the code upgrades came to $6,295,946.95.

On this issue, Landmark argues that the trial court erred by admitting Plaintiff's Exhibit 98 into evidence, claiming that Exhibit 98 was hearsay and was not admissible under the business records exception to the hearsay rule. Landmark contends that Pin-Pon, through its admitting witness, was unable to lay the necessary foundation for the admission of Exhibit 98. We agree.

Whether evidence is admissible under an exception to the hearsay rule is a question of law subject to de novo review. *Browne v. State*, 132 So. 3d 312, 316 (Fla. 4th DCA 2014).

Florida's business records exception to the hearsay rule is set forth in section 90.803(6)(a), Florida Statutes (2011). For a record to be admissible under the business records exception, the proponent must show that (1) the record was made at or near the time of the event; (2) was made by or from information transmitted by a person with knowledge; (3) was kept in the ordinary course of a regularly conducted business activity; and (4) that it was a regular practice of that business to make such a record. *Yisrael v. State*, 993 So. 2d 952, 956 (Fla. 2008). However, the fact that a witness employed all the "magic words" of the exception does not necessarily mean that the document is admissible as a business record. *Yang v. Sebastian Lakes Condo. Ass'n.,* 123 So. 3d 617, 621-22 (Fla. 4th DCA 2013).

To lay a foundation for the admission of a business record, it is not necessary for the proponent of the evidence to call the person who actually prepared the business records. *Cooper v. State*, 45 So. 3d 490, 492 (Fla. 4th DCA 2010). "The records custodian or any qualified witness who has the necessary knowledge to testify as to how the record was made can lay the necessary foundation." *Twilegar v. State*, 42 So. 3d 177, 199 (Fla. 2010) (quoting *Forester v. Norman Roger, Jewell & Brooks Int'l, Inc.*, 610 So. 2d 1369, 1373 (Fla. 1st DCA 1992)). Stated another way, "the witness just need be well enough acquainted with the activity to provide testimony." *Cayea v. CitiMortgage, Inc.,* 138 So. 3d 1214, 1217 (Fla. 4th DCA 2014). "To the extent the individual making the record does not have personal knowledge of the information contained therein, the second prong of the predicate requires the information to have been supplied by an individual who does have personal knowledge of the information and who was acting in the course of a regularly conducted business activity." *Brooks v. State*, 918 So. 2d 181, 193 (Fla. 2005), *receded from on other grounds by State v. Sturdivant*, 94 So. 3d 434 (Fla. 2012).

Nonetheless, the fact that a document is incorporated into a business's records does not automatically bring the document within the business records exception to the hearsay rule. *See Nat'l Car Rental Sys., Inc. v. Holland*, 269 So. 2d 407, 413 (Fla. 4th DCA 1972). "Otherwise, every letter which plaintiff's employer received in connection with the operation of his business and which was subsequently retained as part of his business records ipso facto would be fully competent to prove the truth of its contents." *Id.* Accordingly, in *Holland*, this court held that a Doctor's Certificate, which certified that the plaintiff was qualified to drive a motor vehicle, was not admissible as a business record where "[n]o predicate or inquiry was made here beyond the witness stating that the certificate was part of his business records which he kept in the regular course of his business." *Id.*

Here, Pin-Pon failed to show that all the records in Exhibit 98 were made by or from information transmitted by a person with knowledge. The architect could not testify as to when 25 of the 26 documents were made. And he had no information as to whether the person who made the documents had knowledge or received information from a person with knowledge. While it was not necessary for Pin-Pon to call the person who actually prepared the business records, we find that Pin-Pon did not establish that the architect was either in charge of the activity constituting the usual business practice or was well enough acquainted with the activity to give the testimony. Although the documents in Exhibit 98 might have qualified as the general contractor's business records, the mere fact

that these documents were incorporated into the architect's file did not bring those documents within the business records exception. In short, Pin-Pon failed to lay the necessary foundation for the admission of Exhibit 98 as a business record.

We conclude that the error was not harmless. "To test for harmless error, the beneficiary of the error has the burden to prove that the error complained of did not contribute to the verdict. Alternatively stated, the beneficiary of the error must prove that there is no reasonable possibility that the error contributed to the verdict." *Special v. W. Boca Med. Ctr.*, 39 Fla. L. Weekly S676, S678, 2014 WL 5856384, *4 (Fla. Nov. 13, 2014). Applying this standard, we find there is a reasonable possibility that the error contributed to the verdict. While a Pin-Pon representative testified without objection that the total code upgrade expenses were "upwards of $6 million," Pin-Pon has failed to prove that the erroneous admission of Exhibit 98 did not contribute to the jury's verdict.

Because the court allowed the jury to consider Exhibit 98 in determining the amount of code upgrade damages, we reverse and remand for a new trial as to code upgrade damages only.

Finally, we note that the trial court entered only one final judgment in this case. After the new trial on remand, the trial court should enter two separate judgments: one for the Frances action and one for the Jeanne action.

The Frances and Jeanne actions were separate lawsuits that were consolidated for purposes of trial. However, consolidation has no effect on the substantive rights of the parties in an individual case, and does not destroy the separate identities of the consolidated cases. *See CDI Contractors, LLC v. Allbrite Elec. Contractors, Inc.*, 836 So. 2d 1031, 1033 (Fla. 5th DCA 2002); *see also Wagner v. Nova Univ., Inc.*, 397 So. 2d 375, 377 (Fla. 4th DCA 1981). In a consolidated case, a party who has prevailed under a claim which entitles the party to attorney's fees cannot have that right defeated by a larger award recovered by the opposing party on a separate claim. *Shores Supply Co. v. Aetna Cas. & Sur. Co.*, 524 So. 2d 722, 725 (Fla. 3d DCA 1988. In such a case, the trial court should issue two separate judgments. *Id.*

Here, depending upon the validity of Landmark's proposal for settlement,[4] Landmark might have a substantive right to attorney's fees in

---

[4] The parties argue over whether the proposal for settlement was valid, but that issue should be addressed by the trial court in the first instance.

the Jeanne action. Accordingly, the trial court should enter a separate judgment in each action, so as to preserve any potential substantive right to fees Landmark has in the Jeanne action.

*Affirmed in part, Reversed in part, and Remanded.*

GERBER, J., concurs.
GROSS, J., concurs in part and dissents in part.

GROSS, J., concurring in part, dissenting in part.

I concur in the majority's conclusion a new trial is required on the issue of code upgrade damages.

I dissent from the majority's construction of the insurance policy. My reading of the "Amount of Insurance" section of Endorsement #2 is that it falls under section 2.c. of the "Occurrence Limit of Liability" provision of the policy. The limitations of the policy were $2,500,000 per occurrence and a total amount of coverage of $8,000,000 for the building, $2,000,000 for the contents, and $1,382,368 for business income.

*            *            *

***Not final until disposition of timely filed motion for rehearing.***

13