**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 19a0009n.06

No. 18-3574

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| JOHN KENDLE, | ) | |
| | ) | **FILED** |
| **Plaintiff-Appellant,** | ) | Jan 09, 2019 |
| | ) | DEBORAH S. HUNT, Clerk |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| WHIG ENTERPRISES, LLC et al., | ) | COURT FOR THE SOUTHERN |
| | ) | DISTRICT OF OHIO |
| **Defendants,** | ) | |
| | ) | |
| MITCHELL CHAD BARRETT, | ) | **OPINION** |
| | ) | |
| **Defendant-Appellee.** | ) | |
| | ) | |

Before: COLE, Chief Judge; SUHRHEINRICH and MOORE, Circuit Judges.

**KAREN NELSON MOORE, Circuit Judge.** John Kendle once worked as a distributor for Mitchell Chad Barrett's company, WHIG Enterprises, LLC. The relationship ended on unhappy terms, and eventually Kendle brought suit against WHIG Enterprises, LLC, two of its co-owners, and another affiliated entity. This appeal, however, is concerned only with Kendle's claims against Barrett; Barrett cannot be held liable for any of the misconduct Kendle alleges. Therefore, we **AFFIRM** the judgment of the district court.

**I. BACKGROUND**

John Kendle is a medical salesman. R. 144-12 (Kendle Dep. at 7) (Page ID #1814). He has sold medical devices and pharmaceutical products, both as a representative for pharmaceutical companies and as an independent salesman. *Id.*

Mitchell Chad Barrett was a co-owner of WHIG Enterprises, LLC ("WHIG") at all relevant times. R. 144-20 (Rutland Dep. at 7–8) (Page ID #2297–98). WHIG is a Florida company that manufactures and markets compounded medications. R. 114 (Second Am. Compl. at ¶¶ 1, 6) (Page ID #981–82). "Compounding is custom preparing medications to meet the individual needs of an individual patient. . . . The idea is you have the doctor, the pharmacy and the patient all working together to develop an ideal remedy." R. 144-17 (Kodman Dep. at 7–8) (Page ID #2045).

Kendle's relationship with WHIG began in 2013, when Barrett and Jason Rutland, another WHIG co-owner, approached Kendle with the idea of working together. R. 144-12 (Kendle Dep. at 9–13) (Page ID #1817–21). Kendle was to serve as a distributor for WHIG. *Id.* Two contracts governed their business relationship: a Distributor Consultant Agreement ("DCA") and a Memorandum of Understanding ("MOU"). R. 114-1 (DCA) (Page ID #997); R. 114-2 (MOU) (Page ID #1002).

The DCA was a contract between "WHIG, LLC and affiliates, Florida entities (hereinafter' [sic] The Company') and John Kendle." R. 114-1 (DCA at 1) (Page ID #997). It defined Kendle's duties as an independent contractor and described his compensation. *Id.* at 1–2 (Page ID #997–98). The DCA was to last for a three-year period commencing on September 1, 2013, unless a party terminated the agreement prematurely for a listed reason. *Id.* at 1–3 (Page ID #997–99). The DCA was signed by Kendle and by Barrett "as CEO of WHIG, LLC." *Id.* at 5 (Page ID #1001).

The MOU was signed on August 27, 2013 by John Kendle and by Barrett as "CEO." R. 114-2 (MOU at 7) (Page ID #1008). This contract gave Kendle an interest in an as-yet-unformed limited liability corporation called BAMBRWV, LLC ("BAMBR"). *Id.* at 1 (Page ID

#1002).  (It seems as though this LLC was never created.)  *Kendle v. WHIG Enterprises, LLC*, No. 2:15-cv-1295, 2018 WL 1855189, at *2 (S.D. Ohio Apr. 18, 2018).  The MOU was entered into "by and between WHIG, LLC and John Kendle."  R. 114-2 (MOU at 1) (Page ID #1002).

Kendle and WHIG's relationship started off strong.  Kendle—one of WHIG's many distributors—had a team of around thirty representatives[1] marketing WHIG's product.  R. 144-12 (Kendle Dep. at 26–33) (Page ID #1834–41).  Kendle's team of representatives would distribute a branded prescription pad[2] to doctors.  If a doctor prescribed a medication using that pad, the medication would be compounded at a pharmacy associated with WHIG, and Kendle would receive revenue from these sales.  At some point in time, Kendle's team was generating around one million dollars per month in revenue.  *Id.* at 27–33 (Page ID #1835–41).

Kendle was also working on the BAMBR project.  The BAMBR business model was that WHIG would compensate physicians and other providers who prescribed WHIG products by offering those providers "ownership interests in BAMBR Marketing Groups."  R. 114 (Second Am. Compl. at ¶ 22) (Page ID #986).  Kendle says that he brought two or three doctors into the BAMBR program while working for WHIG.  R. 144-12 (Kendle Dep. at 41) (Page ID #1849).

Finally, Kendle helped WHIG "expand their pharmacies."  *Id.* at 41–42 (Page ID #1849–50).  Barrett and Rutland had asked Kendle to "go out and basically interview pharmacies or seek

---

[1]Kendle paid the representatives out of the commission he received from WHIG; they were not employed by or contractors for WHIG.  R. 144-12 (Kendle Dep. at 30, 33) (Page ID #1838, 1841).

[2]The prescription pads were for "Rx Pro," a pharmacy affiliated with WHIG.  R. 144-10 (Froehlich Dep. at 7–8) (Page ID #1749–50).

out pharmacies or pharmacy owners and talk with them about becoming part of the team." *Id.* at 42 (Page ID #1850). Kendle was successful at least once. He helped negotiate a contract between WHIG and Jim Kodman, the owner of Gatti Compounding in Indiana, Pennsylvania. *Id.* at 42–43 (Page ID #1850–51).

Eventually the relationship with WHIG soured. R. 144-12 (Kendle Dep. at 44) (Page ID #1852). On February 25, 2014, Kendle organized a meeting of WHIG's distributors. *Id.* at 47–48 (Page ID #1855–56). Some of those other distributors "express[ed] concerns" to Kendle about their relationships with WHIG. *Id.* at 55 (Page ID #1863). They were nervous about whether they were being credited for all prescriptions originating from pads they distributed. *Id.* at 55–57 (Page ID #1863–65). They had other concerns also, including worries about "transparency" regarding their compensation and pay disparities between the distributors. *Id.* at 55–68 (Page ID #1863–76). The distributors met at a hotel in Atlanta and developed a list of demands, including paid-for marketing materials and a standardized compensation rate. *Id.* at 61–70 (Page ID #1869–78).

Rutland and Barrett—Kendle's primary contacts at WHIG—stopped communicating with him not long after the distributors' meeting, and Kendle stopped actively generating business for WHIG thereafter. *Id.* at 72–79 (Page ID #1880–87). Barrett and other WHIG executives thought that Kendle was "call[ing] together all of [their] major marketing affiliates . . . to basically do a strike on our company and say, 'Hey, we're not going to market for you unless you pay us more money.'" R. 144-20 (Rutland Dep. at 49) (Page ID #2340). Barrett and WHIG considered Kendle

to be in breach of contract[3] and stopped talking to him. *Id.* at 34 (Page ID #2325). But WHIG did continue talking to Kendle's representatives—it reached out to some of them to let them know that they could work for WHIG directly. R. 144-12 (Kendle Dep. 87–88) (Page ID #1895–96); R. 144-15 (Sales Team List) (Page ID #1975); R. 151-1 (Lee E-Mail) (Page ID #2790); R. 151-3 (Lee Dep. at 14–15) (Page ID #2882–83).

In this fallout, Kendle brought suit in the United States District Court for the Southern District of Ohio. His Second Amended Complaint names as defendants WHIG, Rx Pro Mississippi, Inc.,[4] Barrett, and Rutland.[5] R. 114 (Second Am. Compl.) (Page ID #980). This appeal, however, addresses only the claims against Barrett as an individual. Barrett moved for summary judgment as to all of Kendle's claims against him, and the district court granted Barrett's motion on April 18, 2018. *Kendle*, 2018 WL 1855189. This appeal followed.

## II. ANALYSIS

Jurisdiction in this case is found under the diversity statute 28 U.S.C. § 1332. John Kendle is a citizen of Ohio; defendant WHIG Enterprises, LLC is a Florida corporation with its principal place of business in Mississippi; defendant Rx Pro Mississippi is a Mississippi corporation with

---

[3]Paragraph 4.2 of the DCA says that WHIG may terminate the DCA "immediately without notice at any time for . . . conflict of interest or competitive business activities where as determined by [WHIG] in its reasonable discretion, shall cause material harm . . . to [WHIG] or any Affiliates' [sic] interest." R. 114-1 (DCA at 3) (Page ID #999).

[4]Rx Pro Mississippi, Inc. "is an affiliate of WHIG." R. 114 (Second Am. Compl. at 2) (Page ID #981). Rx Pro is seeking Chapter 11 Bankruptcy. *See* R. 144-1 (Rx Pro Bankruptcy Stay) (Page ID #1282).

[5]The FBI was or is investigating Rutland, Barrett, or WHIG and affiliates. R. 112 (June 7, 2017 Op. at 2) (Page ID #937).

its principal place of business in Mississippi; defendant Mitchell Chad Barrett is a citizen of Mississippi; defendant Jason Rutland is a citizen of Mississippi. R. 114 (Second Am. Compl. at ¶¶ 3, 5) (Page ID #981–82). Kendle is seeking damages in excess of $75,000. *Id.* at ¶¶ 50, 54, 58, 64, 71 (Page ID #992–95). The district court issued an order under Rule 54(b) of the Federal Rules of Civil Procedure that granted final judgment in favor of Mitchell Chad Barrett, and so appellate jurisdiction is proper. R. 170 (Rule 54(b) Order) (Page ID #3021).

We review de novo a district court's decision to grant summary judgment. *Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 771 (6th Cir. 2018). Summary judgment is appropriate if "there is no genuine dispute as to any material fact." FED. R. CIV. P. 56(a). We view all facts and draw all inferences "in the light most favorable to the party against whom summary judgment was entered." *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013).

Kendle asserts three legal bases for Barrett's liability: breach of contract, tortious interference, and unjust enrichment. We address each in turn.

## A. Breach of Contract

As to his breach of contract claims, Kendle is hamstrung by one simple fact: he did not enter into a contract with Barrett.

The DCA is a contract between "WHIG, LLC and affiliates, Florida entities" and "John Kendle, or his assigns." R. 114-1 (DCA at 1) (Page ID #997). The MOU is an agreement between "WHIG, LLC and John Kendle." R. 114-2 (MOU at 1) (Page ID #1002). Barrett signed both agreements, but he signed as CEO of WHIG, LLC. R. 114-1 (DCA at 5) (Page ID #1001); R. 114-2 (MOU at 7) (Page ID #1008).

Kendle attempts to overcome this substantial obstacle by invoking the doctrine that a person who enters into a contract as an agent for an undisclosed principal may be held individually liable on the contract. Appellant Br. at 12. This argument fails.

Florida law, which governs the DCA,[6] and West Virginia law, which likely governs the MOU,[7] both dictate that the plain language of a contract controls in the absence of ambiguity. *Fifth Third Bank v. McClure Props., Inc.*, 724 F. Supp. 2d 598, 605 (S.D. W. Va. 2010) (citing *Blake v. Slate Farm Mut. Auto. Ins. Co.*, 685 S.E.2d 895, 901 (W. Va. 2009)); *Landmark Am. Ins. Co. v. Pin-Pon Corp.*, 155 So. 3d 432, 437 (Fla. Dist. Ct. App. 2015). Here, the language was clear. Kendle was contracting with WHIG (and its Florida affiliates,[8] in the case of the DCA).[9]

---

[6]The DCA has a choice-of-law clause saying that "[t]his Agreement and the employment relationship created by it shall be governed by Florida law." R. 114-1 (DCA at 5) (Page ID #1001). Ohio law generally respects contractual choice-of-law provisions, and the parties do not contest that Florida law governs. *See Jarvis v. Ashland Oil, Inc.*, 478 N.E.2d 786, 789 (Ohio 1985).

[7]The MOU has no choice-of-law provision, but contemplates the creation of a West Virginia corporation. Therefore, it seems likely that West Virginia law would apply. West Virginia's interest in contracts creating corporations under its law is high; the other potentially interested states have little interest. *See* Restatement (Second) of Conflict of Laws § 6 (1971). In addition, the parties apply West Virginia law on appeal. The court below did not explicitly rule on choice of law as to the MOU, but rather found that "under the law of any state, no breach of contract claim will lie in the absence of a valid contract." *Kendle*, 2018 WL 1855189, at *4.

[8]Kendle asserts that "[t]he District Court read language into the DCA which does not exist. The DCA does not limit its application to WHIG's Florida affiliates." Appellant Br. at 12. We disagree. The DCA says that it is a contract between Kendle and "WHIG, LLC and affiliates, Florida entities." R. 114-1 (DCA at 1) (Page ID #997). Although not a model of graceful English, the appended "Florida entities" is clearly modifying what comes before it: "affiliates." Thus, "WHIG, LLC and affiliates" is limited to WHIG's Florida affiliates.

[9]The MOU does not include mention of WHIG's affiliates at all. The contract creates an entity of which John Kendle "or his assigns" will be a member. R. 114-2 (MOU at 1) (Page ID #1002). There is absolutely no potential for ambiguity in the MOU; it is between WHIG and Kendle.

Kendle attempts to insert ambiguity into the DCA by saying that the definition of "affiliates"—"any Company's parent, subsidiary or related entity and/or [] any entity directly or indirectly controlled or beneficially owned in whole or part by the Company or Company's parent, subsidiary or related entity"—creates ambiguity via the phrase "related entity." R. 114-1 (DCA at 1) (Page ID #997); Appellant Br. at 12. This argument does not help Kendle. The doctrine he tries to invoke—agents working on behalf of undisclosed principals—applies when a principal is *undisclosed*. "If defendant want[s] to escape personal liability, it [is] his duty to disclose his principal in some unmistakable manner, in order that plaintiff might know to whom to look for his pay." *Curtis v. Miller*, 80 S.E. 774, 775 (W. Va. 1914). "In order for an agent to avoid personal liability on a contract negotiated in his principal's behalf, he must disclose not only that he is an agent but also the identity of the principal." *Petit-Bois v. A to Z Express of NH, Inc.*, No. 3:06-CV-261, 2006 WL 1529549, at *4 (M.D. Fla. May 24, 2006) (quoting *Van D. Costas, Inc. v. Rosenberg*, 432 So. 2d 656, 658 (Fla. Dist. Ct. App. 1983)). Granted, the contract reveals the name of only one principal (WHIG) and leaves others unnamed (the affiliates). But Kendle cites no caselaw showing that a boilerplate addition of "and affiliates" to the name of a company creates such confusion regarding the identity of the principal that the agent must be held liable. The lack of such caselaw makes sense. A doctrine holding an agent liable when the principal is undisclosed is logical—it allows a contractor to know whom he or she may sue, should it come to that.

Here, Kendle clearly knew WHIG was the principal—he sued it. This is not a case where a person does not know for whom the agent was acting. Barrett was not acting in his own name;

8

he signed the contracts with Kendle on behalf of WHIG. The principal, WHIG, was clearly disclosed. Regardless of what Kendle believed, the clear language of the contract governs.

Summary judgment was appropriate on this claim.

## B. Tortious Interference

Next, Kendle claims that Barrett is liable for tortious interference with his business relationships. Mississippi law, which the parties do not dispute governs this claim,[10] recognizes causes of action for tortious interference with contract and with non-contractual business relationships. *Coleman & Coleman Enters., Inc. v. Waller Funeral Home*, 106 So. 3d 309, 315–16 (Miss. 2012); *MBF Corp. v. Century Bus. Commc'ns, Inc.*, 663 So. 2d 595, 598 (Miss. 1995).

Both causes of action require an act. There is no evidence in the record that Barrett undertook any act that could constitute tortious interference with Kendle's relationship with his sales team. True, WHIG terminated Kendle's contract. And, true also, WHIG solicited some of Kendle's representatives to work directly for it. But it is equally true that it was *Rutland* who did the soliciting. *See* R. 151-1 (Lee E-Mail) (Page ID #2790); R. 151-3 (Lee Dep. at 13–15) (Page ID #2881–83) (describing an e-mail from Jason Rutland); R. 144-10 (Froehlich Dep. at 19) (Page ID #1761) ("Q. Did you have any direct communication with Chad Barrett? A. I did not."). Kendle points out that Barrett ordered the termination of the DCA and MOU. Appellant Br. at 14. The termination of the business relationship between WHIG and Kendle, though, is not an act that

---

[10]WHIG's principal place of business is in Jackson, Mississippi, and Barrett and Rutland are Mississippi residents. R. 114 (Second Am. Compl. at 2–3) (Page ID #981–82). The district court used Mississippi law to analyze the tortious interference claim, and neither party contests choice of law on appeal.

interfered with Kendle's relationship to his sales team. There is nothing showing that Barrett had anything to do with the solicitation of Kendle's sales team or customers.[11]

In the absence of any evidence showing Barrett took an act to interfere tortiously with Kendle's business relationship with his sales team, summary judgment was appropriate.

## C. Unjust Enrichment

Barrett's final theory of liability is unjust enrichment. He argues that he is owed damages in three categories: "(1) unpaid sales commissions for prescriptions originating with Kendle and the sales team from January 2014 through 2016; (2) unpaid profits from the BAMBR Program and; (3) unpaid profits from the Pennsylvania pharmacy business." Appellant Br. at 16.

The parties agree that Mississippi law governs this claim.[12] Under Mississippi law, unjust enrichment applies only when the defendant received payment from the plaintiff by mistake. *Willis v. Rehab Sols., PLLC*, 82 So. 3d 583, 588 (Miss. 2012); *Union Nat'l Life Ins. Co. v. Crosby*, 870 So. 2d 1175, 1180 (Miss. 2004). In addition, Mississippi law "is clear on unjust enrichment—it is based upon a mistaken payment, *and it applies only where no legal contract exists*." *Willis*, 82 So. 3d at 588 (emphasis added). These two principles dispose of Kendle's unjust-enrichment claims.

---

[11]Kendle asserts in a declaration that "Barrett contacted and instructed others to contact numerous members of my sales team." R. 149-1 (Kendle Dec. at 3) (Page ID #2776). This declaration, which is not based on any firsthand knowledge, is not probative evidence and therefore cannot create a genuine issue of material fact. *Am. Speedy Printing Ctrs., Inc. v. AM Mktg., Inc.*, 69 F. App'x 692, 696–97 (6th Cir. 2003).

[12]The reasons to apply Mississippi law to this claim are the same as applied to the tortious interference claim: the majority of the participants resided in Mississippi, and the majority of the relevant action took place in Mississippi. In addition, as with the tortious interference claim, the parties agree that Mississippi law applies. *See* Appellant Br. at 15; Appellee Br. at 14–16.

The first two categories of claims fail because they are governed by a contract. The claim for unpaid sales commissions seeks money owed to Kendle under the DCA; the claim for unpaid profits from BAMBR seeks money owed to Kendle under the MOU. Unjust enrichment applies only where no legal contract exists. *Id.* at 588. Kendle's remedy here is simple: sue on the contract. He cannot claim that the profits that a corporate officer derived from his work under a contract are unjust enrichment.

The third category of unjust enrichment—profits from the Pennsylvania pharmacy business—is not governed by a contract.[13] But all of Kendle's unjust-enrichment claims fail for a second reason. Unjust enrichment applies only when the defendant receives a payment by mistake, and Kendle identifies no mistake. He argues that he "certainly would not have conferred the benefits upon [Barrett] knowing [Barrett] would unjustly retain those benefits." Appellant Br. at 17. The benefits Kendle is referring to are the profits Barrett may have reaped from Kendle's work for WHIG. But "I wouldn't have worked for you if I had known you would have breached the contract" is not a theory of mistake. Rather, a mistake of fact is, for example, a situation in which someone is paid more than he or she is owed for a product due to a mathematical or clerical error. *See Bessler Movable Stairway Co. v. Bank of Leakesville*, 106 So. 445, 445–46 (Miss. 1925) (finding a mistake of fact where plaintiffs-buyers accidentally paid freight costs twice).

---

[13]The complaint does bring a breach-of-contract claim based on the Pennsylvania pharmacy. It alleges that there was an agreement between Barrett, Rutland, and Kendle that Kendle would earn "at least 5% and up to 50% of the revenue generated by the Rx Pro Compounding Pharmacy in Indiana, Pennsylvania." R. 114 (Second Am. Compl. at 14) (Page ID #993). Kendle, however, does not pursue this claim on appeal. There is no evidence in the record that such a contract existed, whether oral or written. Therefore we proceed in this analysis as though the Pennsylvania pharmacy business was not governed by contract, despite the fact Kendle argued otherwise in the past.

Mathematical errors and accidental payments to the wrong person would also fall into the category of "mistake." What Kendle describes is not a mistake; it is regret.

Unjust enrichment is not a valid theory of liability for Kendle's claims. Therefore, summary judgment was appropriate.

### III.  CONCLUSION

For the reasons stated above, we **affirm** the district court's grant of summary judgment.